1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
R. Jason Richards (Admitted *Pro Hac Vice*)
Bryan F. Aylstock (Admitted *Pro Hac Vice*)
Mary Liu (SBN: 282884)
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel. 850-202-1010
Fax: 850-916-7449
jrichards@awkolaw.com
baylstock@awkolaw.com
mliu@awkolaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

LINDSEY DAUGHERTY, TUAN NGUYEN,
JARAD LINN, and COLE SCROGGS,
individually, and on behalf of all
others similarly situated,

                              Plaintiffs,

          v.

PADAGIS (US) LLC and L PERRIGO
COMPANY,
                              Defendants.

Lead Case No. 3:24-cv-01448-EMC

Case No. 3:24-cv-02066-EMC

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT

Lindsey Daugherty, Tuan Nguyen, Jarad Linn, and Cole Scroggs (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendants Padagis (US) LLC ("Padagis") and L Perrigo Company ("Perrigo") (collectively referred to as "Defendants"). Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

2

**NATURE OF THE ACTION**

3

  1.  This is a class action lawsuit regarding Defendants' manufacturing, distribution,

4

advertising, marketing, and sale of Perrigo® branded benzoyl peroxide ("BPO") products[1]

5

6

(collectively the "BPO Products") that contain benzene and/or degrade to form benzene at high levels.

7

Benzene is a known human carcinogen that has been linked to leukemia and other blood cancers.

8

  2.  Throughout this Complaint, references to federal law and Food and Drug

9

Administration ("FDA") regulations are merely to provide context and are not intended to raise a

10

federal question of law. All claims alleged herein arise out of violations of state law, which in no way

11

12

conflict, interfere with, or impose obligations that are materially different than those imposed by

13

federal law.

14

  3.  Prior to placing the BPO Products into the stream of commerce and into the hands of

15

consumers to use on their skin, Defendants knew or should have known that the BPO Products contain

16

benzene and/or degrade to form benzene, but misrepresented, omitted, and concealed this fact to

17

consumers, including Plaintiffs and Class members, by not including benzene on the BPO Products'

18

labels or otherwise warning consumers about its presence.

19

  4.  Plaintiffs and Class members reasonably relied on Defendants' representations that the

20

BPO Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

21

22

  5.  Plaintiffs and Class members purchased the BPO Products, which contain harmful

23

levels of benzene.

24

  6.  The BPO Products are worthless because they contain benzene at levels which render

25

_____

26

[1] The BPO Products refer to Perrigo® Benzoyl Peroxide Acne Treatment Gel 10% BPO, Perrigo®
Benzoyl Peroxide Acne Treatment Gel 5% BPO, Perrigo® Benzoyl Peroxide Acne Treatment Gel 2.5%

27

BPO, Perrigo® Benzoyl Peroxide Acne Medication Wash 10% BPO, and Perrigo® Benzoyl Peroxide
Acne Medication Wash 5% BPO.

28

the BPO Products adulterated, misbranded, and illegal to sell under applicable state laws.

7.     Defendants are therefore liable to Plaintiffs and Class members for misrepresenting and/or failing to disclose or warn consumers that the BPO Products contain benzene and/or degrade to form benzene.

**PARTIES**

8.     Plaintiff Lindsey Daugherty is a resident and citizen of Ukiah, California, located in Mendocino, California. Within the applicable class period, including within the past three years, Plaintiff purchased Defendants' Perrigo® brand Benzoyl Peroxide Acne Treatment Gel 2.5% BPO from Rite-aid in Mendocino County. One of the specific BPO Products purchased by Plaintiff has undergone independent testing and shown to contain benzene at levels that vastly exceed 2 ppm. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of purchase or that the Products degraded to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

9.     Plaintiff Tuan Nguyen is a resident and citizen of Fountain Valley, California, located in Orange County. Plaintiff has purchased and used Defendants' Perrigo® brand Benzoyl Peroxide Acne Treatment Gel 10% BPO regularly since 2018. Plaintiff most recently purchased the BPO Product in 2024 from BT Pharmacy in Westminster, California. Two of the specific BPO Products purchased by Plaintiff have undergone independent testing and shown to contain benzene at levels that

vastly exceed 2 ppm. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of purchase or that the Products degraded to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

10.     Plaintiff Jarad Linn is a resident and citizen of Roseville, California, located in Placer County. For the past several years, including during the class period, Plaintiff was prescribed Defendant's Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO. Plaintiff incurred out-of-pocket expenses as a result of his use of Defendant Perrigo's BPO Products. When using the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to use the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of use or that the Products degraded to form benzene, Plaintiff would not have used the Products at all. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

11.     Plaintiff Cole Scroggs is a resident and citizen of Novinger, Missouri, located in Adair County. For the past several years, including from 2020 through 2023, Plaintiff purchased Defendant's Perrigo® brand Benzoyl Peroxide Acne Medication Wash 10% BPO from retail outlets such as

Walmart in Missouri and online at Amazon.com. One of the specific BPO Products purchased by Plaintiff has undergone independent testing and shown to contain benzene at levels that vastly exceed 2 ppm. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of purchase or that the Products degraded to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

12.     Standing is satisfied by alleging economic injury. Here, Plaintiffs suffered economic injury when they spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendants' misconduct, as alleged herein. Members of the putative Classes have likewise suffered economic injuries in that they have spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendants' misconduct, as alleged herein.

13.     Plaintiffs and putative Class members have suffered a concrete and particularized injury, because they have been denied the opportunity to make informed financial and healthcare decisions due to the Defendants' misconduct. The decision to purchase or not purchase BPO products that contain or degrade to form benzene at any level is a financial and healthcare decision that affects Plaintiffs and members of the putative Class in a very personal and individual way. By failing to disclose the presence of benzene in their BPO Products' labeling, Plaintiffs and individual members of the putative Class were denied the opportunity to make informed decisions, and instead unwittingly

purchased and used BPO Products they would have not have otherwise purchased, or paid less for, absent Defendants' misconduct. Plaintiff's and the putative Class members' injuries are therefore traceable to Defendants' acts or omissions. Plaintiff and the putative Class members also seek monetary damages to address the monetary harm caused by Defendants' actions, so there is a substantial likelihood that the relief sought will redress the injuries. As a result, Plaintiff and members of the putative Class have Article III standing.

14.      Defendant Padagis (US) LLC is a Delaware limited liability company with a principal place of business at 1251 Lincoln Road, Allegan, Michigan 49010.  Defendant Padagis markets, sells, and distributes Perrigo branded BPO Products throughout the United States and its territories. Defendant Perrigo authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its Perrigo branded BPO Products.

15.      Defendant L Perrigo Company is a Michigan corporation with a principal place of business at 515 Eastern Avenue, Michigan 49010. Defendant Perrigo markets, sells, and distributes Perrigo branded BPO Products throughout the United States and its territories. Defendant Perrigo authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its Perrigo branded BPO Products.

16.      All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

## JURISDICTION AND VENUE

17.      This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy, including punitive damages and attorneys' fees, more likely than not exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 Class members and members of the Class are citizens of a state different than Defendants.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiffs suffered injury as a result of Defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendants conduct substantial business in this district, Defendants have intentionally availed themselves of the laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### I.    Defendants' History in the Industry

19.    Defendants manufacturer, market, distribute, and sell various skin care products, including the BPO Products.

20.    Benzoyl peroxide is an active ingredient in all the BPO Products. As such, it is an ingredient intended for use in the manufacture of the BPO Products.

21.    All of Defendants' BPO Products are manufactured in the same manner.

22.    All lots of Defendants' BPO Products contain or systematically degrade to form benzene. As referenced below, this allegation is supported by testing conducted by Valisure LLC ("Valisure") on sixty-six acne treatment products containing benzoyl peroxide, all of which tested positive for benzene at various levels. Defendants' Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO, in particular, was tested by Valisure and found to contain over 14 ppm benzene. These results have been published in peer-reviewed literature.[2] That Defendants' BPO Products contain benzene and/or degrade into benzene is also supported by independent testing conducted on Plaintiff's individual BPO Products, as referenced above.

23.    The rates of degradation and benzene impurities in the BPO Products occur at a

---

[2] Kucera K, Zenzola N, Hudspeth A, Dubnicka M, Hinz W, Bunick CG, Dabestani A, Light DY. Benzoyl Peroxide Drug Products Form Benzene. Environ Health Perspect. 2024 Mar;132(3):37702. doi: 10.1289/EHP13984. Epub 2024 Mar 14. PMID: 38483533; PMCID: PMC10939128.

1    systematic rate.

2                    **II.    *Evidence of Benzene's Danger***

3    24.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as

4    a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major

5

6    United States source of benzene is petroleum.

7    25.    The health hazards of benzene have been recognized for over one hundred years, and

8    the scientific and regulatory communities agree that it is a known human carcinogen with severe

9    consequences to human exposure. The World Health Organization ("WHO") recognizes that,

10    "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health

11    effects and diseases, including cancer and haematological effects."[3] WHO specifically outlines that,

12    "[b]enzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[4]

13

14    26.    A toxicity assessment by the Centers for Disease Control and Prevention has shown

15    benzene can harm the central nervous system and may affect reproductive organs.[5]    The CDC warns

16    that "[b]enzene works by causing cells not to work correctly.  For example, it can cause bone marrow

17    not to produce enough red blood cells, which can lead to anemia.  Also, it can damage the immune

18    system by changing blood levels of antibodies and causing the loss of white blood cells." The CDC

19    also cautions that "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and

20

21    irritation."

22    27.    According to the World Health Organization, "Benzene is a genotoxic carcinogen in

23    _____

24    [3] https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.

25    [4] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010); *see also* WHO, 2019. Preventing disease through healthy environments: Exposure to benzene: a major public health concern. World

26    Health Organization (WHO), available at  https://iris.who.int/bitstream/handle/10665/329481/WHO-CED-PHE-EPE-19.4.2-eng.pdf?ua=1 ("Benzene is carcinogenic to humans, and no safe level of benzene

27    can be recommended.").

    [5] https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf.

28

humans and no safe level of exposure can be recommended."[6]

28.     As stated by Dr. Christoper Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, in Valisure's citizen petition:

> I want to reiterate first and foremost that there is not a safe level of benzene that can exist in any skin care product, over the counter or prescription. Benzene is highly carcinogenic, and recently we've seen the U.S. Food and Drug Administration agree with this position this by taking action to ensure removal of carbomers contaminated with benzene from manufacturing processes. The current data on BPO degrading into high levels of benzene is extremely concerning given its prominent use in skin care, and this study should serve as another wake-up call for improved manufacturing and quality control of consumer healthcare products.[7]

29.     According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[8]

30.     According to the National Toxicology Program, benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[9]

31.     Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[10] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of

---

[6] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010); *see also* WHO, 2019. Preventing disease through healthy environments: Exposure to benzene: a major public health concern. World Health Organization (WHO), available at https://iris.who.int/bitstream/handle/10665/329481/WHO-CED-PHE-EPE-19.4.2-eng.pdf?ua=1 ("Benzene is carcinogenic to humans, and no safe level of benzene can be recommended.").

[7] Valisure Citizen Petition, March 5, 2024 at 28-29, available at https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf.

[8] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[9] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis in original).

[10] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[11]

32.    The U.S. Food and Drug Administration ("FDA") also recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[12] and classifies benzene as a "Class 1" solvent that should be "avoided" in drug manufacturing.[13] FDA guidance provides: "Solvents in Class 1 [e.g. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."[14]

33.    In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[15] The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "levels exceed the guideline value provided by ICH [Q3C][16] and USP[17]" limits, states the report. The evaluation concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent

---

[11] *Id*. at 34.
[12] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q1.
[13] https://www.fda.gov/media/71737/download.
[14] *Id.*
[15] CDER Health Hazard Evaluation, July 8, 2021, available at https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.
[16] The term "ICH" refers to The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance (December 1997), at https://www.fda.gov/media/71736/download?attachment.
[17] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.

impairment of a body function" were "likely to occur" at exposure levels within that range. In addition, the evaluation stated that "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who are exposed to benzene from other sources . . . may be at greater risk." Moreover, all of BPO Products that have been independently tested by Plaintiffs showed benzene levels that vastly exceed those determined by the FDA to cause serious adverse effects.

34.    On December 27, 2023, in response to reports of benzene contamination in various drug products, the FDA published guidance on its website in the form of an "Alert," stating: "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.]… If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"[18]

35.    "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[19]

36.    As with other topically applied products, such as sunscreen, the application of BPO Products specifically increases the absorption rate of benzene through the skin, thereby increasing the risk of harm.[20]  "Direct exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[21]  Accordingly, The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye

[18] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.
[19] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.
[20] *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.
[21] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

1    contact" as exposure routes or paths.[22]

2       37.    The Environmental Protection Agency ("EPA") also recognizes the cancer risks of

3    benzene, noting that "Benzene is classified as a 'known' human carcinogen (Category A) under the

4    Risk Assessment Guidelines of 1986."[23] "[B]enzene is characterized as a known human carcinogen for

5    all routes of exposure based on convincing human evidence as well as supporting evidence from

6    animal studies."[24]

7       38.    EPA has set 0.0005 ppm as the maximum permissible level of benzene in drinking

8    water, with a stated goal of "zero."[25]

9

10      39.    In its review of non-cancer adverse health effects of benzene, the EPA cited

11   epidemiologic evidence that "support a threshold of benzene hematotoxicity[26] in humans in the 5-19

12   ppm range[.]"[27]   As noted in the cited study, "[c]learly, if a significantly elevated risk of benzene

13   poisoning is an indication of hematotoxicity, then certainly exposures to benzene at 5-19 ppm are

14   hematotoxic."[28]

15

16      40.    All of this guidance leads to only one conclusion: Benzene should not be present in OTC

17   BPO Products, even in the smallest amounts, due to the unacceptable, serious health risks.

18

19   _____

20   [22] *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR
     OCCUPATIONAL SAFETY AND HEALTH (NIOSH),
     https://www.cdc.gov/niosh/npg/npgd0049.html.

21   [23] https://cfpub.epa.gov/ncea/iris2/chemicallanding.cfm?substance_nmbr=276.

22   [24] *Id*.
     [25] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-

23   regulations.
     [26] The term "hematotoxic" means "poisonous to the blood and to the organs and tissues involved in

24   the production of blood, such as the bone marrow."
     https://clinicalinfo.hiv.gov/en/glossary/hematotoxic.

25   [27] EPA, Toxicological Review of Benzene (Noncancer Effects) (October 2002), at 38.

26   https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0276tr.pdf. (citing Dosemeci,
     M; Yin, S-N; Linet, M; et al. (1996) Indirect validation of benzene exposure assessment by

27   association with benzene  poisoning. Environ Health Perspect 104 (suppl 6): 1343-1347).
     [28] *Id*.

28

1

### III.    Discovery of Benzene in the BPO Products

2

41.    On March 5, 2024, Valisure submitted a public citizens petition to the FDA requesting

3

a recall and suspension of sales of benzoyl peroxide from the U.S. market. The petition was based on

4

Valisure's findings that numerous BPO products contained elevated levels of benzene, a known human

5

carcinogen.[29]

6

7

42.    "Valisure operates an analytical laboratory that is accredited under International

8

Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA

9

Accreditation Number 94238)," and it "is registered with the Drug Enforcement Administration

10

(License # RV0484814)."[30] As an industry leader in independent chemical testing of medications,

11

Valisure works with large private health care systems like Kaiser Permanente and governmental

12

healthcare systems like the Military Health System through the U.S. Department of Defense.[31]

13

14

43.    In its citizens petition, Valisure reported its testing results for benzene in various types

15

of BPO drug products, mostly utilizing gas chromatography and detection by mass spectrometry

16

("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion

17

chromatograms, along with Selected Ion Flow Tube-Mass Spectrometry ("SIFT-MS") for detection of

18

benzene released into the air around certain BPO products. Valisure also used other orthogonal

19

approaches for confirmation of a few select products.[32]

20

21

44.    GC-MS "is generally considered one of the most accurate analyses available."[33] The

22

23

[29] https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf.

24

[30] Id.

25

[31] Valisure Signs Agreement with Department of Defense to Independently Test & Quality Score Drugs. (August 8, 2023). PR Newswire. (https://www.prnewswire.com/newsreleases/valisure-signs-agreement-with-department-of-defense-to-independently-test--quality-score-drugs301895301.html).

26

27

[32] Id. at 10.

28

[33] GC/MS Analysis, Element, available at https://www.element.com/materials-testing-
(footnote continued)

FDA used the same method to test for impurities like benzene in hand sanitizers[34] and sunscreen products.[35]

45.    "The GC-MS method described in [Valisure's] petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[36]

46.    As reported, Valisure analyzed sixty-six different BPO containing drug products, both prescription and over-the-counter ("OTC") for the presence of benzene. Valisure acquired the products and incubated the products at 50°C[37] for 18 days, with samples measured at day 0, 4, 10, 14, and 18. These BPO containing products represented creams, lotions, gels, washes, liquids, and bars, and included analysis of Defendant Perrigo's Acne Treatment Gel 5% BPO.[38] As demonstrated below, results from this 50°C stability showed that every one of the sixty-six products, including Defendant Perrigo's Acne Treatment Gel 5% BPO, contained some level of benzene.[39]

47.    Valisure's findings with respect to its benzene testing of the BPO Product has been published in peer-reviewed literature.[40]

---

services/chemical-analysis-labs/gcms-analysis-laboratories.
[34] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), available at https://www.fda.gov/media/141501/download.
[35] Laboratory Information Bulletin # 4674, Identification and Quantitation of Benzene Impurity in Sunscreen Product by Headspace Gas Chromatography-Mass Spectrometry Detection (HSGC-MS), available at https://www.fda.gov/media/169772/download.
[36] *Valisure Citizen Petition* at 10-11 (citations omitted).
[37] "50°C (122°F) is not only a reasonable temperature that 'the product may be exposed to during distribution and handling by consumers' but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." *Id.* at 18-19 (citations omitted).
[38] *Id.* at 16, 23.
[39] *Id.* at 16-18.
[40] Kucera K, Zenzola N, Hudspeth A, Dubnicka M, Hinz W, Bunick CG, Dabestani A, Light DY. (footnote continued)

48.    As noted in the chart below, testing conducted by Valisure on Defendant Perrigo's Acne Treatment Gel 5% BPO, in particular, revealed benzene levels over 14 ppm.[41]

Benzoyl Peroxide Drug Products Form Benzene. Environ Health Perspect. 2024 Mar;132(3):37702. doi: 10.1289/EHP13984. Epub 2024 Mar 14. PMID: 38483533; PMCID: PMC10939128.
[41] *Valisure Citizen Petition* at 16.



**Figure 4A**



**Figure 4B**



**Figure 4C**









Figure 4G



Figure 4H



Figure 4I

49.    Independent testing conducted on BPO Products purchased by Plaintiffs similarly shows benzene levels significantly above the FDA's recall threshold of 2 ppm.

50.    Importantly, the BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatment products such as the BPO Products manufactured, distributed, and sold by Defendants. Further, although Defendants list the ingredients on the BPO Products' labels, Defendants fails to disclose on the Products' labeling or anywhere in their marketing that the BPO

Products contain benzene or that the Products can degrade to form benzene.

51.    And despite their personal knowledge that BPO Products previously sold to consumers (including Plaintiffs) and currently in distribution contain over 2 ppm benzene, to date Defendants have failed to issue a voluntary recall. This is unconscionable, considering that FDA guidance provides that Class 1 solvents like benzene should not be employed in the manufacture of drug substances or drug products "because of their unacceptable toxicity"[42] and that FDA guidance does not establish that a BPO Product with benzene levels under 2 ppm is safe for human use. Nevertheless, Defendants continues to manufacture, market, and sell their adulterated BPO Products for profit. This illustrates Defendants' wanton and reckless conduct, their callous disregard for the law, and their disregard for the health and safety of consumers who buy their BPO Products, justifying an award of punitive damages.

## IV.    Benzene Renders the BPO Product Adulterated, Misbranded, and Illegal to Sell

52.    The BPO Products are "drugs" used to treat acne (i.e., *acne vulgaris*), formulated with a chemical called benzoyl peroxide, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the BPO Products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. Under the FDCA, a drug is adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packaging, or holding do not confirm to or are not operated or administered in conformity with current good manufacturing practice…."[43]

53.    Benzene is restricted by the FDA to 2 ppm where its use in manufacturing "is

---

[42] *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene*; Guidance for Industry – Final Guidance. US FDA, December 27, 2023 (citing 2018 ICH Q3C guidance at p. 5) (available at https://www.regulations.gov/document/FDA-2023-D-5408-0002).
[43] 21 U.S.C. § 351(a)(2)(B).

unavoidable in order to produce a drug product with a significant therapeutic advance."[44] Except in such "limited cases," Class 1 solvents such as benzene should not be employed in the manufacture of drug substances or drug products "because of their unacceptable toxicity."[45] Defendants' BPO Products do not meet this safe harbor exception. This is because the use of benzene in the manufacture of the BPO Products is not "unavoidable," nor does the use of benzene in BPO Products provide a "significant therapeutic advance."

54.     In December 2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and "remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications (21 CFR 211.84, 21 CFR 211.160). This includes testing of raw materials and finished product batches (21 CFR 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity."[46] The warning continued: "If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"[47]

55.     This FDA alert was updated on December 27, 2023, and still provides that drug manufacturers "should not release any drug product batch that contains benzene above 2 ppm" and

---

[44] 2018 ICH Q3C guidance, at p. 5. US FDA, June 2017 (available at https://www.fda.gov/media/71737/download).

[45] *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene*; Guidance for Industry – Final Guidance. US FDA, December 27, 2023 (citing 2018 ICH Q3C guidance at p. 5) (available at https://www.regulations.gov/document/FDA-2023-D-5408-0002).

[46] "FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs," January 5, 2022, available at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[47] *Id*. The FDA cannot force a drug manufacturer to recall a contaminated or adulterated drug. *See* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp ("While FDA cannot force a company to recall a drug, companies usually will recall voluntarily or at FDA's request").

"[i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"

56.     It is therefore illegal under federal law to manufacture and distribute drug products in the United States that contain benzene above 2 ppm.[48] Hence, within the past three years alone, the FDA has announced over a dozen recalls of various drug and cosmetic products identified as containing "low levels" or even "trace levels" of benzene, including certain hand sanitizers and aerosol drug products like sunscreens and antiperspirants.[49]

## V.     *Drugs Must Be Manufactured in Compliance with Current Good Manufacturing Practices ("cGMPs")*

57.     Under federal law, pharmaceutical drugs must be manufactured in accordance with cGMPs to ensure they meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B). In other words, entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

58.     Defendants acknowledge that they must comply with cGMPs with respect to all the products they manufacture.[50] Defendants further acknowledge that "[t]he failure of one of [its] facilities to comply with applicable laws and regulations may lead to a breach of representations made

---

[48] 21 U.S.C. § 351(a)(2)(B).
[49] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol;
https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/edgewell-personal-care-issues-voluntary-nationwide-recall-banana-boat-hair-scalp-sunscreen-due-0;
https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice#:~:text=The%20Procter%20%26%20Gamble%20Company%20(NYSE,level%20due%20to%20the%20presence.
[50] https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318106118&type=PDF&symbol=PRGO&cdn=f1909fa88dcf3ef59a777d36011b4609&companyName=Perrigo+Company+plc&formType=10-K&dateFiled=2024-02-27.

1    to our customers."[51]

2         59.    Apart from compliance with federal cGMPs, U.S. state and territorial drug regulation

3    laws impose an independent duty on drug manufacturers to ensure that end purchasers receive drugs

4    that are made in accordance with cGMPs. This duty emanates from each state's adoption or adherence

5    to federal cGMP and adulteration standards, including but not limited to the following parallel state

6    statutes:

7

8         • Alabama Code §§ 20-1-24 and -27(1);

9         • Alaska Statutes § 17.20.290(a)(1);

10        • Arizona Statutes §§ 32-1965(1), (2) and -1966(3);

11        • Arkansas Code § 20-56-215(1);

12        • California Health and Safety Code §§ 111260;

13        • Colorado Statutes §§ 25-5-403(1)(a),(b) and -414(1)(c);

14        • Title 16, Delaware Code §§ 3302 and 3303(2);

15        • District of Columbia Code § 48-702(2);

16        • Florida Statutes §§ 499.005(1) and .006(3);

17        • Georgia Code § 26-3-3(1);

18        • Guam Statutes 10 G.C.A. § 40114;

19        • Hawaii Revised Statutes §§ 328-6(1) and -14(1)(B)(ii);

20        • Idaho Code § 37-115(a);

21        • Iowa Code §§ 126.3(1) and .9(1)(c);

22        • Chapter 410, Illinois Statutes §§ 620/3.1 and /14(a)(2)(B);

23        • Kentucky Statutes § 217.175(1);

24

25

26

27    _____

28    [51] *Id.*

• Maryland Code, Health–General §§ 21-216(c)(5)(2) and -256(1);

• Massachusetts General Laws chapter 94 §§ 186 and 190;

• Minnesota Statutes §§ 151.34(1) and .35(1);

• Missouri Statutes § 196.015(1);

• Montana Code §§ § 50-31-305(3) and -501(1);

• Nebraska Revised Statutes §§ 71-2461(2) and -2481;

• Nevada Statutes § 585.520(1);

• New Hampshire Revised Statutes §§ 146:1(I) and :4(V);

• New Mexico Statutes §§ 26-1-3(A) and -10(A);

• New York Education Law § 6811;

• North Dakota Century Code §§ 19-02.1-02(1) and .1-13(3);

• Ohio Code § 3715.52(A)(1);

• Oklahoma Statutes title 63 § 1-1402(a);

• Title 35, Pennsylvania Statutes § 780-113(a)(1);

• Title 21, Rhode Island General Laws § 21-3-3(1);

• South Carolina Code §§ 39-23-30(a)(2)(B) and -80(A)(1);

• South Dakota Code §§ 39-15-3 and -10;

• Title 18, Vermont Statutes § 4052(1);

• Virginia Code § 54.1-3457(1);

• West Virginia Code §§ 16-7-1 and -2(a)(3); and

• Wyoming Statutes §§ 35-7-111(a)(i)–(iv), (vi) and -116.

## VI.    *Defendants' Violation of Current Good Manufacturing Practices ("cGMP's")*

60.    Drug manufacturers bear responsibility for the content of their labels at all times.

61.    Any drug product not manufactured in accordance with cGMPs is deemed "adulterated"

or "misbranded" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a),

351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

62. In 2010, the FDA issued a "final rule to include benzoyl peroxide as a generally

recognized as safe and effective (GRASE) active ingredient in over-the-counter (OTC) topical drug

products." 75 FR 9776, OTC Monograph M006 (Part 333, subpart D, Topical Acne Drug Products for

OTC Human Use).

63. However, "[a]ny product which fails to conform to an applicable monograph after its

effective date is liable to regulatory action." 21 C.F.R. § 330.10(b).

64. In other words, once a final monograph goes into effect, it is illegal to sell a drug that

no longer conforms to "each of the conditions contained in this part [330.1] and in an applicable

monograph[.]" 21 U.S.C. §§ 330.1. The "conditions contained in this part"—i.e. the conditions under

which the FDA designates an over-the-counter drug as GRASE—include a requirement that "(a) [t]he

product is manufactured in compliance with current good manufacturing practices, as established by

parts 210 and 211 of this chapter."

65. The cGMPs identified in part 210 "contain the minimum current good manufacturing

practices for methods to be used in, and the facilities or controls to be use for, the manufacture,

processing, packaging, or holding of a drug to assure that such drug meets the requirements of the act

as to safety, and … meets the quality and purity characteristics that it purports or is represented to

possess." 21 U.S.C. 210.1(a).

66. The "manufacture, processing, packaging, or holding of a drug product includes

packaging and labeling operations, testing, and quality control of drug products." 21 U.S.C. 210.3(12).

67. "The failure to comply with any regulation set forth in this part [210] … in the

manufacture, processing, packaging, or holding of a drug shall render such drug to be adulterated

under section 501(a)(2)(B) of the act [FDCA 21 U.S.C. 301 *et seq.*] and such drug, as well as the

person who is responsible for the failure to comply, shall be subject to regulatory action." 21 U.S.C. Part 210.1(b).

68.     Defendants have violated numerous cGMPs in their manufacture of BPO Products, including:

(a)     Failure to establish and/or follow "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality and purity they purport or are represented to possess," as required by 21 C.F.R. § 211.100(a), (b);

(b)     Failure to establish and/or follow "in-process controls, and tests, or examinations to be conducted on appropriate samples of in-process materials of each batch [of drug products] … to monitor the output and to validate the performance of those manufacturing processes that may be responsible for variability in the characteristics of in-process material and the drug product," as required by 21 CFR § 211.110(a);

(c)     Failure to test in-process materials "for identity, strength, quality, and purity … during the production process, e.g., at commencement or completion of significant phases or after storage for long periods," as required by 21 CFR § 211.110(c);

(d)     Failure to test or examine sample lots of components for conformity with all written specifications for purity, strength, and quality, as required by 21 C.F.R. § 211.84(d);

(e)     Failure to test or examine each lot of components for conformity with all written specifications for purity, strength, and quality, as required by 21 C.F.R. § 211.84(d)(2);

(f)     Failure to establish "time limits for the completion of each phase of production … to assure the quality of the drug product," as required by 21 CFR § 211.111;

(g)     Failure to establish and/or follow warehouse procedures for the "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products is not affected," as required by 21 CFR § 211.142(b);

(h)     Failure to establish and/or follow "test procedures, or other laboratory control mechanisms" to "assure that components[52], … in-process materials, labeling, and drug products conform to appropriate standards of identity, quality, and purity," as required by 21 C.F.R. § 211.160(a), (b);

---

[52] "Component means any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product." 21 C.F.R. § 210.3(3).

(i)     Failure to ensure that "[f]or each batch of drug product, there shall be appropriate laboratory determination of satisfactory conformance to final specifications for the drug product, including the identity and strength of each active ingredient, prior to release," as required by 21 C.F.R. § 211.165(a);

(j)     Failure to establish and/or follow an adequate acceptance criteria for the sampling and testing of drug products "to assure that batches of drug products meet each appropriate specification and appropriate statistical quality control criteria as a condition for their approval and release," as required by 21 C.F.R. § 211.165(d);

(k)     Failure to reject drug products that "failed to meet established standards or specifications and other quality control criteria," as required by 21 C.F.R. § 211.165(f);

(l)     Failure to follow the responsibilities and procedures applicable to the quality control unit "to determine compliance with all established, approved written procedures before a batch is released or distributed," as required by 21 C.F.R. § 211.192;

(m)     Failure to follow the responsibilities and procedures applicable to the quality control unit to "thoroughly investigate" "any unexplained discrepancy … or the failure of a batch or any of its components to meet any of its specifications …, whether or not the batch has already been distributed," as required by 21 C.F.R. § 211.192;

(n)     Failure to make available to the quality control unit "[a]dequate laboratory facilities for the testing and approval (or rejection) of components, … in-process materials, and drug products," as required by 21 C.F.R. § 212.22(b);

(o)     Failure to follow the responsibilities and procedures applicable to the quality control unit by retesting or reexamining drug components for identity, quality and purity (e.g. after storage for long periods of time or after exposure to air, heat or other conditions that might adversely affect the components), as required by 21 C.F.R. § 211.87;

(p)     Failure to establish control procedures to validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug market, as required by 21 CFR § 211.110(a);

(q)     Failure to review and approve drug product production and control records by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed, as required by 21 C.F.R. § 211.192;

(r)     Failure to clean, maintain, and sanitize equipment and utensils at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product, as required by 21 C.F.R. § 211.67(a);

(s)     Failure to follow written production and process control procedures in the execution of production and process control functions, as required by 21 C.F.R. §

21.100(b);

(t)    Failure to maintain equipment to prevent malfunctions or contamination that would alter the safety, identity, strength, quality or purity of the drug product beyond the official or other established requirements, as required by 21 C.F.R. § 211.67; and

(u)    Failure to reject sample lots of components that did not meet the appropriate written specifications of identity, quality and purity and related tests under 21 C.F.R. § 211.84(d), as required by 21 C.F.R. § 211.84(e).

69.    Defendants' BPO Products did not conform to the final monograph specifications after its effective date, in violation of 21 C.F.R. § 330.10(b), which demonstrates inadequate production, process, and quality oversight by Defendants.

70.    Defendants' failure to conform to cGMPs resulted in the production, and ultimate sale to consumers, of BPO Products that were so highly contaminated and/or adulterated with benzene that they could not be legally sold in the United States, yet Defendants still falsely labeled and marketed their illegal Products as compliant with state and FDCA drug regulations. That Defendants' BPO Products were able to reach the U.S. market with such high levels of benzene indicates that there was a critical failure in Defendants' quality control and testing protocols as required by the above-referenced cGMPs as incorporated into state law.

71.    Prior to the applicable class period, Defendants knew or should have known that their BPO Products contain benzene and/or degrade to form benzene, which rendered the Products adulterated and misbranded.

72.    In sum, the BPO Products sold during the applicable class period failed to conform to the final monograph after its effective date because the Products (1) contain benzene and/or degrade to form benzene at excessive levels[53] and/or (2) are adulterated and misbranded and, thus,

---

[53] "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.]" FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs, 12/27/2023, at (footnote continued)

illegal to sell,[54] in violation of 21 C.F.R. § 330.10(b) and state law counterparts.

## VII.    Adulterated or Misbranded Drugs are Illegal to Sell

73.    It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug that is adulterated or misbranded.[55]

74.    It is unlawful for any person to advertise any drug that is adulterated or misbranded.[56]

75.    A drug may be adulterated under federal and applicable state laws if:

"it consists in whole or in part of any filthy, putrid, or decomposed substance";[57] or

it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health[58]; or

its purity or quality falls below that which it purports or is represented to possess;[59] or

---

https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[54] "If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs, 12/27/2023, at https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[55] 21 U.S.C. § 351; Cal. Health & Safety Code § 111250 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is adulterated."); Cal. Health & Safety Code § 111295; Cal. Health & Safety Code § 111450 ("It is unlawful for any person to receive in commerce any drug … that is misbranded or to deliver or proffer for delivery any drug[.]"); Mo. Rev. Stat. § 196.015(1) ("The following acts and the causing thereof within the state of Missouri are hereby prohibited: (1) The manufacture, sale, or delivery, holding or offering for sale any … drug … that is adulterated or misbranded").

[56] Cal. Health & Safety Code § 110398; Mo. Rev. Stat. § 196.015(11).

[57] 21 U.S.C. § 351(a)(2)(B); Cal. Health & Safety Code § 111250; Mo. Rev. Stat. § 196.095(1).

[58] 21 U.S.C. § 351(a)(1); Cal. Health & Safety Code § 111255; Mo. Rev. Stat. § 196.095(1); see also Mo. Rev. Stat. § 196.010 (the term "contaminated with filth" applies to any drug not reasonably protected from "injurious contaminations").

[59] 21 U.S.C. § 351(b); Mo. Rev. Stat. § 196.095(6); Cal. Health & Safety Code § 111280; Cal. Health & Safety Code § 111285.

any substance has been mixed or packed with it so as to reduce its quality or strength.[60]

76.     A drug may be misbranded under federal and applicable state laws:

"If its labeling is false or misleading in any particular"[61]; or

If it is dangerous to health under the conditions of use prescribed in the labeling thereof[62]; or

If the manufacturer, distributor or seller engages in "[t]he dissemination of any false advertisement."[63]

77.     Defendants could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them. Specifically, BPO as a raw material is known to be thermally stable at purities as high as 75% up to temperatures of 98°C.[64] Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no evidence of the instability and formation of benzene seen in formulated final products of BPO containing acne treatments.[65] Thus, if BPO is inherently stable as a pure, crystalline powder, a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed.[66]

78.     The mere presence of benzene in the BPO Products renders the Products adulterated, misbranded, and illegal to sell. As such, the BPO Products have no economic value and are worthless.

---

[60] Cal. Health & Safety Code § 111290; Mo Rev. Stat. § 196.095(7).
[61] 21 U.S.C. § 352(a)(1); Cal. Health & Safety Code § 111330; Mo. Rev. Stat. § 196.100(1) (adopting labeling requirements contained in FDCA and any regulations promulgated thereunder); *see also* Mo. Rev. Stat. § 196.101(2) (drug may be misbranded if its "labeling is misleading").
[62] 21 U.S.C. § 352(j); Cal. Health & Safety Code § 111400; Mo. Rev. Stat. § 196.100 (adopting FDCA labeling requirements).
[63] Mo. Rev. Stat. § 196.015(5); *see also* Cal. Health & Safety Code § 110395 (unlawful for any person to manufacture, sell, deliver or offer for sale any drug that is falsely advertised).
[64] *Valisure Citizens Petition* at 25 (citation omitted).
[65] *Id.*
[66] *See id.* at 25-26.

1   Worse, as manufactured, the levels of benzene contained in the BPO Products are dangerous to health

2   under the conditions of use prescribed in the labeling and advertising.[67]

3        79.    This is supported by the FDA's July 2021 Health Hazard Evaluation, which concluded

4   that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment

5   of a body function," were "likely to occur" at exposure levels of between 11.2 to 23.6 ppm benzene.[68]

6   Defendants' BPO Products, as tested by Valisure and by Plaintiffs in this case, contain benzene within

7   the range or above these "life-threatening" levels.

8

9        80.    Defendants engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful

10  conduct stemming from their misrepresentations and omissions regarding benzene in their BPO

11  Products.

12       81.    If Defendants had disclosed to Plaintiffs and putative Class members that the BPO

13  Products contain and/or degrade to form benzene, Plaintiffs and putative Class members would not

14  have purchased the BPO Products.

15

16       82.    Further, as manufacturers, distributors, and sellers of acne treatment products,

17  Defendants had and have a duty to ensure that their BPO Products did not and do not contain excessive

18  (or any) level of benzene, including through regular testing, especially before injecting the BPO

19  Products into the stream of commerce for consumers to use on their skin.[69] This includes testing of

20  raw materials and finished product batches prior to release to ensure they meet appropriate

21

22

23  [67] Mo. Rev. Stat. § 196.095(2).

    [68] CDER Health Hazard Evaluation, July 8, 2021, available at

    https://article.images.consumerreports.org/prod/content/dam/CRO-Images-

24  2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment. Similarly, in its review of the

    noncancer effects of benzene, the EPA cites to studies in the medical literature which "support a

25  threshold of benzene hematotoxicity in humans in the 5-19 ppm range, in broad agreement with the

    emerging exposure-response range that is apparent from the epidemiologic studies[.]" EPA,

26  Toxicological Review of Benzene (Noncancer Effects) (October 2002), at 38.

27  https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0276tr.pdf.

    [69] 21 CFR 211.84; 21 CFR 211.160.

28

specifications for identity, strength, quality, and purity.[70] But Defendants made no reasonable effort to test their BPO Products for the presence of benzene or test whether the Products could degrade into benzene over the course of the shelf-life of the Products. Nor did Defendants disclose to Plaintiffs in any advertising or marketing that their BPO Products contained or would degrade into benzene. To the contrary, Defendants represented that their BPO Products were of merchantable quality, safe to use as prescribed, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

### VIII.   Defendants' Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiffs and Reasonable Consumers

83.     BPO degrades to benzene when exposed to heat over time. This process was first reported in scientific literature as early as 1936.[71]

84.     The issue of BPO decomposition into benzene has been previously identified and acted upon in industries other than in the acne treatment product industry.

85.     For example, at least one patent application was filed by the chemical company Akzo Nobel N.V. in 1997 which "relates to a method for reducing the rate of free benzene and/or benzene derivative formation in BPO formulations based on organic plasticizers, such as pastes, emulsions, suspensions, dispersions and the like."[72]

86.     In the polymer manufacturing industry, BPO's decomposition into benzene has been studied and concern was raised specifically regarding the carcinogenic implications of the presence of

---

[70] 21 CFR 211.165.

[71] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden*, HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153.

[72] Borys F. SchafranBryce Milleville (1997). "Reduction of benzene formation in dibenzoyl peroxide formulations." Akzo Nobel N.V. Worldwide application, WO1997032845A1. (https://patents.google.com/patent/WO1997032845A1/en)

benzene. In 1994, a paper was published[73] by researchers at Denmark's Department of Environmental Chemistry titled "Formation of benzene by hardeners containing benzoyl peroxide and phthalates" and stated:

> Recently, during the investigation of benzene residues in chemical products (Rastogi 1993a),[74] it was observed that the benzene content in benzoyl peroxide containing hardeners of two component repair-sets (fillers, elastomers) were >2 % (w/w) [20,000 ppm]. Benzene is carcinogenic (IARC 1982), and its use in consumer and industrial products is generally avoided.

87.     The study continues with heating of various BPO-containing products at 34°C, 50°C and 80°C, finding substantial benzene formation at elevated temperatures, even exceeding levels found in Valisure's March 2024 public citizens petition. Furthermore, similar to Valisure's results, Rastogi finds that only formulations of BPO are unstable, while BPO alone is relatively stable:

> Even heating of BPO-phthalate mixtures at 50°C produced significant amounts of benzene (approximately 0.3% [3,000 ppm]), while no benzene production was detected when benzoyl peroxide was heated alone at this temperature (Table 2).[75]

88.     The referenced 1993 Rastogi article above, titled "Residues of Benzene in Chemical Products," has also been flagged by the EPA as part of its Health & Environmental Research Online ("HERO") system.[76]

89.     Chemical evidence of carcinogenicity has been reported since at least 1981.[77] Multiple studies in the 1980s were conducted using animal models that suggested carcinogenic potential of

---

[73] Rastogi SC. Formation of benzene by hardeners containing benzoyl peroxide and phthalates. *Bull Environ Contam Toxicol*. 1994 Nov;53(5):747-52. doi: 10.1007/BF00196949. PMID: 7833612.

[74] Rastogi, S.C. Residues of benzene in chemical products. Bull. Environ. Contam. Toxicol. 50, 794-797 (1993). https://doi.org/10.1007/BF00209940.

[75] *Id.*

[76] US Environmental Protection Agency. Health & Environmental Research Online (HERO). "Residues of Benzene in Chemical Products." HERO ID 2894703 (http://hero.epa.gov/hero/index.cfm/reference/details/reference__id/2894703).

[77] Slaga TJ, Klein-Szanto AJ, Triplett LL, Yotti LP, Trosko KE. Skin tumor-promoting activity of benzoyl peroxide, a widely used free radical-generating compound. Science. 1981 Aug 28;213(4511):1023-5. doi: 10.1126/science.6791284. PMID: 6791284.

benzoyl peroxide, including the use of commercial drug formulations of BPO like that of Defendants.[78]

90.    Defendant Padagis represents itself as "a pharmaceutical manufacturer that offers high quality generic Rx and OTC products that meet strict standards of quality and safety."[79] Padagis represents that its vision is to "[i]mprove the well-being of … consumers by providing high quality" healthcare products.[80] Padagis further claims that it is "all about improving people's lives by developing, manufacturing and distributing quality healthcare products."[81] And, Padagis admits it is an "expert[] on extended topical products."[82] Because drug manufacturers, such as Defendants, are held to the skill of an expert in the field, they must keep abreast of scientific advances. A reasonably prudent manufacturer is deemed to know of reliable information generally available or reasonably obtainable in the industry or in the particular field involved. As such, Defendants were aware of the established chemical processes that cause their BPO Products to contain benzene and/or degrade to form benzene when exposed to commonly used temperatures and conditions.

91.    Defendants, as a large, sophisticated corporations in the business of manufacturing, distributing, and selling products containing BPO, knew or should have known the BPO Products were

---

[78] Kurokawa Y, Takamura N, Matsushima Y, Imazawa T, Hayashi Y. *Studies on the promoting and complete carcinogenic activities of some oxidizing chemicals in skin carcinogenesis.* Cancer Lett. 1984 Oct;24(3):299-304. doi: 10.1016/0304-3835(84)90026-0. PMID: 6437666; Pelling JC, Fischer SM, Neades R, Strawhecker J, Schweickert L. *Elevated expression and point mutation of the Ha-ras proto-oncogene in mouse skin tumors promoted by benzoyl peroxide and other promoting agents.* Carcinogenesis. 1987 Oct;8(10):1481-4. doi: 10.1093/carcin/8.10.1481. PMID: 3115617; 81 O'Connell JF, Klein-Szanto AJ, DiGiovanni DM, Fries JW, Slaga TJ. *Enhanced malignant progression of mouse skin tumors by the free-radical generator benzoyl peroxide.* Cancer Res. 1986 Jun;46(6):2863-5. PMID: 3084079; 82 Iversen OH. *Carcinogenesis studies with benzoyl peroxide (Panoxyl gel 5%).* J Invest Dermatol. 1986 Apr;86(4):442-8. doi: 10.1111/1523-1747.ep12285787. PMID: 3091706.
[79] https://www.padagis.com/12-2/.
[80] https://www.padagis.com/about/.
[81] https://www.linkedin.com/company/padagis-llc/.
[82] https://www.linkedin.com/company/padagis-llc/about/.

contaminated with excess levels of benzene and that testing the Products for benzene was necessary to protect Plaintiffs and Class members from harmful levels of benzene exposure.

92.     Defendants' manufacturer and use of BPO itself put it on notice of the excessive levels of benzene (i.e. defects) in the BPO Products.

93.     Notwithstanding this knowledge, Defendants failed to appropriately and adequately test their BPO Products for the presence of benzene to protect Plaintiffs and Class members from dangerous levels of benzene exposure.

94.     In fact, Defendants sold, and continue to sell, BPO Products during the class period despite their knowledge that the levels of benzene in their Products exceed FDA guidelines and pose a threat of serious adverse effects on consumers.

95.     Benzene is not listed on the BPO Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products. The following images provide an example of the labels for the BPO Products at issue:

FIRST AMENDED CLASS ACTION COMPLAINT



96.     Plaintiffs have standing to represent members of the putative Class because there is sufficient similarity between the specific BPO Product purchased by Plaintiffs and the other BPO Products not purchased by Plaintiffs. Specifically, each and every one of the BPO Products (i) are marketed in substantially the same way – as an acne treatment— and (ii) fail to include labeling indicating to consumers that the BPO Products contain benzene and/or degrade to form benzene. Accordingly, the misleading effect of all the BPO Products' labels are substantially the same.

97.    Defendants have engaged in deceptive, untrue, and misleading advertising by failing to warn about the presence of benzene in their BPO Products.

98.    As alleged, the presence of benzene in the BPO Products renders the Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the BPO Products had they been truthfully and accurately labeled.

99.    Moreover, had Defendants adequately tested their BPO Products for benzene, they would have discovered that the Products contained benzene at levels above the FDA's "safe harbor" exception limit of 2 ppm (even assuming the safe harbor exception applied), making the Products illegal to distribute, market, and sell, thus warranting a recall.

100.    Accordingly, Defendants knowingly, recklessly, or at least negligently, introduced the contaminated, adulterated, and misbranded BPO Products into the U.S. market.

### IX.    Injuries to Plaintiffs and Class Members

101.    When Plaintiffs purchased Defendants' BPO Products, Plaintiffs did not know, and had no reason to know, that Defendants' BPO Products contain and/or degrade to form the potentially harmful carcinogen benzene. Not only would Plaintiffs not have purchased, or paid less for, Defendants' BPO Products had they known the Products contain and/or degrade to form benzene, but they would also not have been capable of purchasing the Products if Defendants had done as the law required and tested the Products for benzene.

102.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must rely on Defendants to truthfully and honestly report on the BPO Product's packaging and labeling what the Products contain.

103.    Given Defendants' position as a leader in the acne treatment market, Plaintiffs and Class members trusted and relied on Defendants' representations and/or omissions regarding their

1   BPO Products.

2       104.    Here, Defendants' misrepresentations and/or omissions were material. Plaintiffs and

3   Class members made purchasing decisions based on Defendants' advertising and representations,

4   including representations and/or omissions on the BPO Products' labeling with respect to the

5   ingredients, warnings, and other information contained therein. To be sure, the decision to purchase (or

6   not purchase) BPO Products that contain and/or degrade into benzene at any level is a financial and

7   healthcare decision that affects Plaintiffs and Class members in a very personal and individual way. It

8   is perfectly reasonable for consumers to be concerned about potential carcinogens contained in the

9   products they purchase and put onto and into their bodies.

10

11      105.    Plaintiffs and Class members have been denied the opportunity to make such informed

12  financial and healthcare decisions due to the Defendants' misconduct, and instead unwittingly

13  purchased and used BPO Products they would have not have otherwise purchased, or paid less for,

14  absent Defendants' misconduct. Plaintiffs and the Class members' injuries are therefore traceable to

15  Defendants' acts and/or omissions.

16

17      106.    As alleged, Defendants' false, misleading, omissions, and deceptive misrepresentations

18  regarding the presence of benzene in the BPO Products are likely to continue to deceive and mislead

19  reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class

20  members.

21

22      107.    Plaintiffs and Class members bargained for products free of contaminants and

23  dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the BPO

24  Products because the Products are worthless. Specifically, the BPO Products are misbranded,

25  adulterated with harmful levels of benzene, and thus illegal to sell, yet Defendants failed to warn

26  consumers of this fact.

27      108.    As a proximate result thereof, Plaintiffs and Class members are entitled to statutory and

28

punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

109.    All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

## CLASS ALLEGATIONS

110.    Plaintiffs, individually and on behalf of all others similarly situated, bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3).

111.    Plaintiffs seek to represent a Class defined as:

### Multi-State Class

> All consumers who purchased Padagis/Perrigo branded benzoyl peroxide products in the United States of America and its territories from April 4, 2020 to the present for personal or household use within the applicable limitations period.

112.    In the alternative, Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the following state Subclasses:

### California Class

> All persons who purchased Padagis/Perrigo branded benzoyl peroxide products in the State of California from April 4, 2020 to the present for personal or household use within the applicable limitations period.

### Missouri Class

> All persons who purchased Padagis/Perrigo branded benzoyl peroxide products in the State of Missouri from April 4, 2020 to the present for personal or household use within the applicable limitations period.

113.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entities in which Defendants or their parents and any entities in which Defendants have a controlling interest and their current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the BPO Products.

114.    Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

115.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendants' possession.

116.    *Commonality*: Questions of law or fact common to the Class include:

a.    Whether the BPO Products contain benzene;

b.    Whether a reasonable consumer would consider the presence of benzene in the BPO Products to be material;

c.    Whether Defendants knew or should have known that the BPO Products contain benzene;

d.    Whether Defendants misrepresented the BPO Products contain and/or degrade into benzene;

e.    Whether Defendants failed to disclose that the BPO Products contain and/or degrade into benzene;

f.    Whether Defendants concealed that the BPO Products contain and/or degrade into benzene;

g.    Whether Defendants engaged in unfair or deceptive trade practices;

h.    Whether Defendants violated the state consumer protection statutes alleged herein;

i.    Whether Defendants were unjustly enriched; and

j.    Whether Plaintiffs and Class members are entitled to damages.

117.    *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the

same legal theories.

118.     *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

119.     *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

120.     Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## COUNT I

**(Violations of the Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *Et Seq., Individually, and on Behalf of the California Subclass*)**

121.     Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

122.     Plaintiffs Lindsey Daugherty and Tuan Nguyen bring this cause of action on behalf of themselves, and all members of the California Subclass, all of whom are similarly situated consumers.

123.    California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq*., prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising." Defendants regularly transact business in California, including in this District, and have engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

124.    Defendants misrepresented their BPO Products in advertising, labels, and containers and misled Plaintiffs, the Subclass, and the public about the ingredients, characteristics, purity, quality, approval, and safety of the Products. Defendants led Plaintiffs, the Subclass, and the public to believe the BPO Products were safe and had characteristics, purity, and quality that the Products did not have.

125.    Defendants' advertising, online representations, labeling, and packaging of the BPO Products was misleading, fraudulent, and deceptive. Defendants knew through the Products' development, formulation, research, and pre-sale safety and stability testing, that the Products were not chemically and physically stable when exposed to common temperature conditions. Defendants knew or should have known the Products formulated benzene under normal and expected consumer use, handling, and storage conditions, and that consumers would be exposed to benzene. Defendants were specifically reminded by the FDA of their obligation to ensure the safety and quality of their BPO Products, including testing them for benzene before selling them to the public, but shirked their duties and continued to market and sell the Products without substantiating their safety, or warning Plaintiffs, the Class, and the public about benzene.

126.    Defendants omitted material health and safety information (e.g. the presence of benzene) from the Products' advertising, label, container, and warnings. Defendants did not tell Plaintiffs and the Class members they would be exposed to benzene, a known human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' container closed.

127.    Defendants' acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about what ingredients and potential contaminants are contained in BPO Products. Reasonable consumers certainly expect that known human carcinogens in the Products be disclosed. Reasonable consumers further expect drugs to be free of known human carcinogens, unless told otherwise. That benzene is contained in a widely marketed drug product used by children, teens, adults and the public in general is material health information reasonable consumers expect to be told.

128.    Had Defendants been truthful in their advertising, labeling, packaging, and online statements about benzene in the BPO Products, or the risk that such Products would degrade into benzene, Plaintiffs and the Subclass members would not have bought the Products, or paid less for them.

129.    Defendant' acts, omissions, and/or concealment of material health and safety information are ongoing and continuing to cause harm. Defendants continue to market, advertise, and sell the Products to the public without telling the public that benzene is contained in the Products and/or that the Products degrade to form benzene. Defendants continue to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not tested the Products for benzene or quantified the levels of benzene formed in the Products during normal and expected storage conditions.

130.    Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the Subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information such as benzene in the BPO Products and the consumers' risk of harm from using the Products is unethical, unscrupulous, and offensive.

131.    Plaintiffs and the Class members suffered ascertainable economic losses because of

Defendants' misconduct because they bought the Products they would  otherwise would not have bought, or paid less for, but for Defendants' misrepresentations and/or affirmations of safety.

132.     Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the California Subclass, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, *et seq*., including an injunction to enjoin Defendants from continuing their fraudulent and deceptive business practices. The damages sought are ascertainable, uniform to Plaintiffs and the Subclass, and can be measured and returned to the Subclass members.

## COUNT II

**(Violations of the Consumers Legal Remedies Act (the "CLRA"), Cal. Bus. & Prof. Code § 1750, *Et Seq., Individually, and on Behalf of the California Subclass*)**

133.     Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

134.     Plaintiffs Lindsey Daugherty, Tuan Nguyen, and Jarad Linn bring this cause of action on behalf of themselves, and the California Subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

135.     Defendants' acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendants. Defendants regularly transacts business in California, including in this District, and have engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

136.     California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*. prohibits unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods. Defendants violated several prohibitions of CIV. CODE § 1750(a).

137.     Defendants violated CAL. CIV. CODE § 1750(a)(2) by representing (1) the source,

sponsorship, and approval, of the BPO Products (*e.g.*, that the Products "meet strict standards of quality and safety"[83]), (2) that Defendants met their obligations to conduct adequate and meaningful quality and safety testing before selling the Products to the public, that Defendants source "high quality raw materials and packaging components" for their Products,[84] that Defendants "maintain a strict program of verification and product testing throughout the ingredient sourcing and manufacturing process to identify potential … adulterants, and toxic substances,"[85] and (3) the Products only contained the active and inactive ingredients listed, and were free of defects (i.e. known human carcinogens).

138.    Defendants violated CAL. CIV. CODE § 1750(a)(3) by representing the affiliation, connection, or association with, or certification by, another (*e.g.*, that the BPO Products "meet strict standards of quality and safety"[86] and that their Products "comply in all material respects with existing regulations to which we [Perrigo] are subject"[87]).

139.    Defendants violated CAL. CIV. CODE § 1750 (a)(4) by using deceptive representations (*e.g.*, that the BPO Products were pure, of good quality, safe, validated, only contained the active and inactive ingredients disclosed, supported by the latest research, and free from latent defects such as benzene).

140.    Defendants violated CAL. CIV. CODE § 1750(a)(5) by representing the BPO Products

---

[83] https://www.padagis.com/12-2/.

[84] https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318106118&type=PDF&symbol=PRGO&cdn=f1909fa88dcf3ef59a777d36011b4609&companyName=Perrigo+Company+plc&formType=10-K&dateFiled=2024-02-27.

[85] *Id.*

[86] https://www.padagis.com/12-2/.

[87] https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318106118&type=PDF&symbol=PRGO&cdn=f1909fa88dcf3ef59a777d36011b4609&companyName=Perrigo+Company+plc&formType=10-K&dateFiled=2024-02-27.

have characteristics, ingredients, uses, or benefits, which they do not (*e.g.*, misleading Plaintiffs and the Class members that the BPO Products only contained the listed active and inactive ingredients, did not contain latent defects (i.e. benzene), and did not increase the risk of harm from using the Products).

141.    Defendants violated CAL. CIV. CODE § 1750(a)(6) by representing the BPO Products were not deteriorated unreasonably or altered (*e.g.*, that the Products were pure and did not contain benzene and/or degraded to form benzene).

142.    Defendants violated CAL. CIV. CODE § 1750(a)(7) by representing the BPO Products were pure and of a particular standard or quality, when they are not.

143.    Defendants violated CAL. CIV. CODE § 1750(a)(9) by advertising the BPO Products with the intent not to sell them as advertised (*e.g.*, that the Products were of pure quality, safe, made in conformity with cGMPs, and not adulterated).

144.    Had Defendants been truthful in their advertising, labeling, packaging, warnings, and online statements about benzene in the BPO Products and the risk inherent therein, Plaintiffs and the California Subclass members would not have bought the Products, or paid less for them. That benzene, a known human carcinogen, was present in a widely marketed and available consumer drug product, is material health and safety information Defendants knew Plaintiffs, the Subclass members, and the public would want to know. The Defendants' omission of this material information was common to Plaintiffs and all Subclass members and was made to Plaintiffs and all Subclass members uniformly through common advertising, online representations, labeling, and packaging.

145.    Defendants' acts, omissions, and concealment of material health and safety information are ongoing and continue to cause harm. Defendants continue to market, advertise, and sell the BPO Products to the public without telling the public about the presence of benzene in the Products and the risks inherent therein.  Further, Defendants continue to market themselves as a responsible drug manufacturer and seller who sells safe products when they have not quantified the levels of benzene

contained in and/or created in the Products during normal and expected storage conditions.

146.    Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the California Subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information such those presented by exposure to benzene in the BPO Products is unethical, unscrupulous, and offensive.

147.    Plaintiffs and the California Subclass members suffered ascertainable economic losses as a result of Defendants' misconduct because they bought BPO  Products they would not have otherwise bought, or paid less for, but for Defendants' misrepresentations.

148.    Because of Defendants' misconduct, Plaintiffs, on behalf of themselves and the California Subclass seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable under CAL. CIV. CODE § 1750, *et seq*., including an injunction to enjoin Defendants from continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the Subclass and can be measured and returned to the Subclass members.

## COUNT III

### (False Advertising Under Various State Statutes, *Individually, and on Behalf of the California Subclass*)

149.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

150.    Plaintiffs Lindsey Daugherty, Tuan Nguyen, and Jarad Linn bring this cause of action on behalf of themselves, and all members of the California Subclasses, all of whom are similarly situated consumers.

151.    Defendants develop, test, select, market and/or sell the BPO Products throughout the United States in its stores and through e-commerce websites. Defendants knew through the BPO Products' development, formulation, and selection that the Products were not chemically stable when

exposed to certain expected and normal environmental and storage conditions and formed benzene, as a toxic byproduct. Despite this knowledge, Defendants did not mention benzene in the Products' advertising, ingredient lists, labels, containers, or warnings. Defendants did not tell Plaintiffs or Subclass members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' containers closed.

152.    That benzene, a known human carcinogen, is present in the BPO Products is material health and safety information Defendants knew Plaintiffs, and the Subclass members would want to know. Defendants not only omitted this material human health and safety information from advertising, online representations, blogs, labeling, packaging, and warnings, but aggressively marketed themselves as a consumer conscious, market leader, company committed to consumer safety. Defendants' brand notoriety, market share, and affirmations of safety misled Plaintiffs, and the Subclass members, leading them to believe the BPO Products were tested, verified, and safe. Defendants further marketed the BPO Products to healthcare professionals such as dermatologists, who were not aware of the presence of benzene in the Products. In doing so, Defendants omitted from their marketing any reference to the fact that it refused or failed to conduct adequate and meaningful testing before marketing and selling the Products to the public, even after the FDA's 2022 alert "remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications."

153.    Defendants' acts and/or omissions constitute false advertising. Defendants advertised the BPO Products with the intent not to sell them as advertised. Reasonable consumers, including Plaintiffs and the Subclass members, exposed to Defendants advertising would believe the Products were safe, verified, and free of benzene.

154.    Defendants' false and misleading advertising violated California's False Advertising

Law, Bus. & Prof. Code § 17500 *et seq*., which prohibits Defendants from disseminating statements "which are untrue or misleading, and which are known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Defendants knew or should have known the BPO Products contained benzene and/or formed benzene under normal, handling, use, and storage conditions, but did not disclose this to Plaintiffs and the Class and Subclass members. Defendants also knew or should have known the BPO Products were not chemically stable when exposed to certain normal and expected environmental conditions.

155.    Had Defendants been truthful in their advertising, online representations, labeling, and packaging about benzene, Plaintiffs, and the Subclass members would not have bought the BPO Products, or would have paid less for them.

156.    Plaintiffs, on behalf of themselves and the California Subclass members, suffered ascertainable economic losses because of Defendants' misconduct when they bought BPO Products they otherwise would not have but for Defendants' material misrepresentations.

157.    Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the California Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendants from continuing their fraudulent business practices. The damages sought are ascertainable, uniform, and can be measured and returned to the Subclass members.

## COUNT IV

### (Deceptive Trade Practices Under Various State Statutes, *Individually, and on Behalf of the Nationwide Class and the California and Missouri Subclasses*)

158.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

159.    Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and

all members of the California and Missouri Subclasses, all of whom are similarly situated consumers.

160.    Defendants' acts and omissions constitute deceptive business practices in violation of state deceptive trade practices laws.

161.    Defendants represented the BPO Products had characteristics, uses, and benefits, they did not have. For example, Defendants represented the BPO Products were pure, of good quality, safe, and only contained the active and inactive ingredients disclosed.

162.    Defendants represented the BPO Products were not deteriorated or altered, when they knew, or should have known, the BPO Products contain benzene and/or degrade to form benzene under normal and expected use, handling, and storage conditions.

163.    Defendants advertised the BPO Products with the intent not to sell them as advertised.

164.    Defendants' acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendants.

165.    Defendants' acts and omissions violated the Missouri Merchandising Practices Act, MO. REV. STAT. § 407, *et seq*., which prohibits the use of deception, fraud, misrepresentations, or unfair practices by a business—for example, marketing the BPO Products as safe, approved, tested, and only containing the listed ingredients. Missouri's law further prohibits the suppression or omission of material facts such as the BPO Products' containing benzene and/or degrading into benzene.

166.    Had Defendants been truthful in their advertising, labeling, and packaging of the BPO Products and not omitted material health and safety information about the presence of benzene and/or the Product degrading into benzene, Plaintiffs, the Class, and Subclass members would not have bought the Products.

167.    Defendants' acts and omissions and violations of the state consumer protection statutes are ongoing and continuing to cause harm.

168.    Plaintiffs, on behalf of themselves and the Subclasses, suffered an ascertainable economic loss as a result of Defendants' misconduct when they purchased the Products—Products they would not have purchased, or paid less for, but for Defendants' misrepresentations.

169.    Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the state Subclasses seek recovery of their economic damages, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are ascertainable, uniform and can be measured and returned.

## COUNT V

**(Breach of Implied Warranty of Merchantability, *Individually and on Behalf of the Nationwide Class and the Subclasses*)**

170.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

171.    Plaintiffs bring this cause of action individually and on behalf of (1) all consumers who purchased BPO Products directly from Defendants (for which there is privity), (2) all consumers whose state law has abrogated the privity requirement for implied warranty of merchantability claims seeking economic loss, and (3) all California Subclass members.

172.    Defendants impliedly warranted that their BPO Products were merchantable, fit and safe for ordinary use.

173.    Under California law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

174.    A "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such

1   knowledge or skill." Cal. Com. Code § 2104(1).

2       175.    Defendants are a "merchants" within the meaning of Cal. Com. Code § 2104(1).

3       176.    "Goods" includes "all things (including specifically manufactured goods)[.]" Cal. Com.

4   Code § 2105(1). The BPO Products are "goods" under the California Code.

5       177.    To be merchantable the goods, among other things, must be (1) "fit for the ordinary

6   purposes for which such goods are used" and (2) "adequately contained, packaged, and labeled[.]" Cal.

7   Com. Code § 2314(2)(c), (e). Defendants have violated these implied warranties.

8       178.    First, because the BPO Products contain benzene and/or degrade to form benzene,

9   including at levels that exceed the FDA's "safe harbor" exception (even assuming the safe harbor

10  exception applied), they are not fit for the ordinary purposes for which such Products are used.

11      179.    Indeed, the levels of benzene contained in the BPO Products have been indisputably

12  linked to negative health consequences.[88]

13      180.    Second, as alleged, the BPO Products were not adequately labeled because they did not

14  disclose that they contain benzene and/or degrade into benzene.

15      181.    California recognizes an exception to the privity requirement in breach of implied

16  warranty claims pertaining to drug products where the products are unfit for human consumption or

17  use. In California, implied warranties run with drugs to the ultimate consumer. As noted, the warranty

18  here is that the drug is merchantable, fit, and safe for its intended purpose—that is, for human use or

19  application as an acne treatment product.

20      182.    Plaintiff and members of the Class purchased the BPO Products in reliance upon the

21  fact that the Products were merchantable, fit, and safe for ordinary use for which they were sold. They

---

[88] CDER Health Hazard Evaluation, July 8, 2021, available at
https://article.images.consumerreports.org/prod/content/dam/CRO-Images-
2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

were not. The defect in the BPO Products (i.e. the presence of benzene) render the Products unfit for human use or application as an acne treatment product. As such, Plaintiffs meet the drug exception to the privity requirement recognized by California courts.

183.    Moreover, the BPO Products were not altered by Plaintiff or members of the Class; Plaintiff and members of the Class were foreseeable users of the BPO Products; and Plaintiff and members of the Class used the BPO Products in the manner intended.

184.    In sum, the BPO Products did not measure up to the promises or facts stated in the labeling, written literature, media advertisements and communications by and from Defendants.

185.    Contrary to Defendants' implied warranties, the BPO Products were defective, unmerchantable, and unfit for their ordinary use when sold.

186.    By reason thereof, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial.

## COUNT VI

**(Negligent Misrepresentation/Omission, *Individually, and on Behalf of the Nationwide Class and the Subclasses*)**

187.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

188.    Plaintiffs bring this claim individually, and on behalf of the Nationwide Class and Subclasses.

189.    Through their labeling and advertising, Defendants made representations to the Plaintiffs and the Class members concerning the quality, safety, and purity characteristics of their BPO Products.

190.    Defendants had a common law duty to provide accurate and non-misleading information to consumers with respect to the quality, safety, and purity characteristics of their BPO, including defects, and to not omit such material quality, safety, and purity characteristic information.

More specifically, Defendants had the duty and obligation not to sell products that were adulterated with benzene. This duty existed independently from any contractual obligations between the parties

191.    Defendants breached their duty to accurately disclose in its labeling and advertising that the BPO Products contain benzene and/or degrade into benzene.

192.    As a manufacturer, Defendants also had a common law duty (and a duty under appliable drug safety laws) to use reasonable care in the design and manufacture of its BPO Products, including the duty to perform reasonable tests and inspections of its Products to discover latent defects (such as the presence of benzene). This duty existed independently from any contractual obligations between the parties.

193.    Defendants are experts in the field who had exclusive knowledge of the defect (i.e. benzene) that gave rise to the duty to disclose. Conversely, Plaintiffs are unsophisticated consumers who do not have the same level of sophistication or knowledge or access to the same information regarding defects as the Defendant manufacturers.

194.    Defendants breached their duty to perform reasonable tests and inspections of their BPO Products for latent defects (*i.e.* the presence of benzene) prior to selling those Products to consumers such as Plaintiffs and Class members.

195.    Defendants had a common law duty to not make false representations or deceive consumers with respect to their BPO Products. This duty existed independently from any contractual obligations between the parties.

196.    Defendants breached their duty when they made false representations regarding the quality, safety, and purity characteristics about their BPO Products.

197.    Such failures to disclose on the part of Defendants amount to negligent omissions and the representations regarding the quality, safety, and purity characteristics of the BPO Products amount to negligent misrepresentations.

198.    Plaintiffs and the other Class and Subclass members reasonably relied upon all such representations and omissions to their detriment.

199.    Moreover, Plaintiffs were foreseeable victims of Defendants' misconduct. Defendants knew or should have known that manufacturing and selling BPO Products containing benzene rendered the Products adulterated and/or misbranded under state law and, thus, illegal to sell, and that Plaintiffs would suffer the very financial loss which ultimately occurred.

200.    Defendants' breaches of their duties were a direct and proximate cause of the economic harms to Plaintiffs and the California Subclass members.

201.    By reason thereof, Plaintiffs and the other Class and Subclass members have suffered damages in an amount to be proven at trial.

## COUNT VII

**(Unjust Enrichment/Quasi-Contract,[89] *Individually, and on Behalf of the Nationwide Class and the California and Missouri Subclasses*)**

202.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

203.    Plaintiffs bring this cause of action individually, and on behalf of the Nationwide Class and the California and Missouri Subclasses.

204.    Defendants enticed Plaintiffs to purchase and/or use their BPO Products through false and misleading labeling that the Products were merchantable, fit and safe to use. They were not. Instead, the BPO Products were adulterated with benzene and/or degraded to form benzene at excessive levels, rendering the Products unfit and unsafe and illegal to sell.

---

[89] In California, there is not a standalone cause of action for "unjust enrichment," so California courts may "construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). The California Subclass seeks to have this claim construed as a quasi-contract claim seeking restitution consistent with California law.

205.    Defendants have unjustly profited from their deceptive business practices and kept the profits from Plaintiffs and the Class and Subclass members who purchased the BPO Products.

206.    Defendants requested and received a measurable economic benefit at the expense of Plaintiffs, the Class, and Subclass members as payment for the BPO Products. Defendants accepted the economic benefits from Plaintiffs, the Class, and Subclass members knowing the economic benefit received was based on deception and omission of material human health and safety information.

207.    There is no utility in Defendants' misconduct and Defendants' enrichment from the misconduct is unjust, inequitable, unconscionable, and against the strong public policy to protect consumers against unlawful conduct.

208.    Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, and the public, seek recovery of their actual damages, disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendants' BPO Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendants to bear the costs of Class notice;

B.    An order enjoining Defendants from selling the BPO Products;

C.    An order enjoining Defendants from suggesting or implying that the BPO Products are safe for human application;

D.    An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing BPO Products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.    An order requiring Defendants to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.    An order requiring Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of any wrongful or unlawful act or practice;

H.    An order requiring Defendants to pay all actual and statutory damages, including, where available, punitive damages (*e.g.* Mo. St. 407.025(2)(1), permitted under the counts alleged herein;

I.    An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

J.    An order providing for all other such equitable relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

//
//
//

1

2    DATED: October 25, 2024.                   **AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,**
                                                **PLLC**
3
                                                <u>/s/ R. Jason Richards</u>
4                                               R. Jason Richards, Esq. (Admitted *Pro Hac Vice*)
                                                Bryan F. Aylstock (Admitted *Pro Hac Vice*)
5                                               Mary Liu, Esq. (SBN: 282884)
                                                17 East Main Street, Suite 200
6                                               Pensacola, FL 32502
                                                Tel. 850-202-1010
7                                               Fax: 850-916-7449
                                                jrichards@awkolaw.com
8                                               mliu@awkolaw.com
                                                cduer@awkolaw.com
9

10

11                                              *Attorneys for Plaintiffs and the Proposed Classes*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

1

**CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that on October 25, 2024, I caused the foregoing document to

3

be electronically filed with the Clerk of the Court by using the CM/ECF system which will send

4

a notice of electronic filing to all counsel of record.

5

6

Respectfully Submitted,

7

/s/ *R. Jason Richards*

8

AYLSTOCK, WITKIN,
KREIS & OVERHOLTZ, PLLC
R. JASON RICHARDS (*Admitted Pro Hac Vice*)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT