1

2

3

4                                    UNITED STATES DISTRICT COURT

5                                   NORTHERN DISTRICT OF CALIFORNIA

6

7        LINDSEY DAUGHERTY, et al.,              Case No.  24-cv-02066-EMC

8                      Plaintiffs,

9                v.                              ORDER ON DEFENDANTS' MOTION
                                                 TO DISMISS
10       PADAGIS US LLC, et al.,

11                     Defendants.               Docket Nos. 51, 60

12

13                   I.        **INTRODUCTION**

14           Plaintiffs Lindsey Daugherty, Tuan Nguyen, Jarad Linn, and Cole Scroggs (collectively

15   "Plaintiffs") bring this proposed class action against Defendants Padagis (US) LLC and L Perrigo

16   Company (collectively "Defendants").  First Amended Complaint ("FAC") ¶¶ 1, 8-11 (Dkt. 50).

17   Plaintiffs purchased "Perrigo® branded benzoyl peroxide ('BPO') products (collectively the 'BPO

18   Products')" in California and Missouri.  *Id.*  Plaintiffs allege that Defendants' BPO Products

19   "contain benzene and/or degrade to form benzene at high levels" and that benzene is a carcinogen.

20   *Id.* ¶¶ 1-2.  Plaintiffs allege that Defendants failed to include product labels alerting or "otherwise

21   warning consumers" of benzene in the BPO Products.  *Id.* ¶¶ 3-4.  Plaintiffs only allege economic

22   harm, *i.e.* they "would not have purchased and used the Products at all or would have paid

23   significantly less for them" had they known that the BPO Products contained/degraded to form

24   benzene.  *Id.* ¶¶ 8-11.

25           Plaintiffs bring seven state law claims against Defendants all related to the alleged

26   misrepresentation and/or warning omission.  Before the Court is Defendants' Motion to Dismiss

27   Plaintiffs' FAC for: (1) lack of subject matter jurisdiction and (2) failure to state a claim.  Motion

28   to Dismiss (Mot.) (Dkt. 51).  For the reasons below, Defendants' motion to dismiss is **STAYED**

United States District Court
Northern District of California

1    and Plaintiffs' administrative motion is denied as moot.

## II.    BACKGROUND

### A.    Factual Background

Plaintiffs are four residents of California and Missouri who purchased "Perrigo® Benzoyl Peroxide Acne Treatment Gel 10% BPO, Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO, Perrigo® Benzoyl Peroxide Acne Treatment Gel 2.5% BPO, Perrigo® Benzoyl Peroxide Acne Medication Wash 10% BPO, and Perrigo® Benzoyl Peroxide Acne Medication Wash 5% BPO" (collectively "BPO Products").  FAC ¶ 1, n.1.

Defendants manufacture and sell BPO Products, and benzoyl-peroxide is an active ingredient in all of Defendants' BPO Products.  *Id.* ¶¶ 19-20.  Plaintiffs allege that "[a]ll of Defendants' BPO Products are manufactured in the same manner[, and] [a]ll lots of Defendants' BPO Products contain or systematically degrade to form benzene."  *Id.* ¶¶ 21-22.  Plaintiffs rely on testing by Valisure LLC, who tested sixty-six benzoyl-peroxide acne treatments, including Defendants' Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO.  *Id.* ¶ 22.  That product was "found to contain over 14 ppm benzene" by Valisure.  *Id.*  Benzene has serious health impacts and is a known carcinogen.  *Id.* ¶¶ 24-40.  Based on its testing, Valisure submitted a petition to the FDA "requesting a recall and suspension of sales of benzoyl peroxide from the U.S. market."  *Id.* ¶ 41.  "Independent testing conducted on BPO Products purchased by Plaintiffs similarly shows benzene levels significantly above the FDA's recall threshold of 2 ppm."  *Id.* ¶ 49.  Benzene is not listed as an ingredient on the BPO Products labeling, nor are the BPO Products designed to contain benzene.  *Id.* ¶ 50.  In 2022 and 2023, the FDA issued alerts to manufacturers about the risks of benzene contamination and the need for testing of ingredients and products.  *Id.* ¶¶ 55-56.  Plaintiffs also claim that "Defendants could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients" and that Defendants knew or should have known about the contamination/degradation.  *Id.* at ¶ 77.

Because the BPO Products contain and/or degrade to form benzene, Plaintiffs allege that the products are adulterated or misbranded, and therefore illegal to sell.  *Id.* ¶¶ 73, 83-94.  Plaintiffs bring seven claims under various state laws:

United States District Court
Northern District of California

First, on behalf of the California subclass, Plaintiffs allege that Defendants have engaged in "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising," in violation of California's Unfair Competition Law. *Id.* ¶¶ 121-32.

Second, on behalf of the California subclass, Plaintiffs allege that Defendants engaged in "unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods," in violation of California's Consumer Legal Remedies Act. *Id.* ¶¶ 133-48.

Third, on behalf of the California subclass, Plaintiffs allege that Defendants omission of benzene information (ingredient or warning) constitutes false advertising, in violation of California's False Advertising Law. *Id.* ¶¶ 149-57.

Fourth, on behalf of the nationwide class, Plaintiffs allege that Defendants engaged in deceptive trade practices by misrepresenting the safety and ingredients of the BPO Products. *Id.* ¶¶ 158-69.

Fifth, on behalf of the nationwide class, Plaintiffs allege that Defendants breached the implied warranty of merchantability that their BPO Products were merchantable, fit and safe for ordinary use because the BPO Products contain benzene and/or degrade to form benzene and were not adequately labeled. *Id.* ¶¶ 170-86.

Sixth, on behalf of the nationwide class, Plaintiffs allege that Defendants violated "a common law duty to provide accurate and non-misleading information to consumers with respect to the quality, safety, and purity characteristics of their BPO" Products by selling adulterated products. Defendants also violated "a common law duty (and a duty under appliable drug safety laws) to use reasonable care in the design and manufacture of its BPO Products, including the duty to perform reasonable tests and inspections of its Products." *Id.* ¶¶ 187-201.

Seventh, on behalf of the nationwide class, Plaintiffs bring a claim for unjust enrichment/quasi-contract based on Defendants' profiting from their misleading labeling. *Id.* ¶¶ 202-08.

Plaintiffs seek, *inter alia*: "[a]n order enjoining Defendants from selling the BPO Products;" "[a]n order enjoining Defendants from suggesting or implying that the BPO Products

3

1  are safe for human application;" "[a]n order requiring Defendants to engage in a corrective

2  advertising campaign and engage in any further necessary affirmative injunctive relief, such as

3  recalling existing BPO Products;" restitution/damages; disgorgement; and statutory damages.  *Id.*

4  at 55-56.

5  **B.**     **Regulatory Background**

6         The BPO Products are nonprescription drugs or over-the-counter ("OTC") drugs to treat

7  acne.  The Food and Drug Administration ("FDA") regulates OTC drugs and issues monographs

8  that establish conditions under which an OTC drug is generally recognized as safe and effective

9  for its intended use.  *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71,

10  75, (2d Cir. 2013) ("Like a recipe, each monograph sets out the FDA-approved active ingredients

11  for a given therapeutic class of OTC drugs and provides the conditions under which each active

12  ingredient is [generally recognized as safe and effective].").  "Any product [that] fails to conform

13  to each of the conditions contained in … an applicable monograph is liable to regulatory action."

14  21 C.F.R. § 330.1.

15         As Plaintiffs recognize, the FDA's Acne Monograph regulates the BPO Products.  FAC ¶¶

16  62, 69.  The Acne Monograph has been incorporated into the regulations.  *See* 21 C.F.R. § 333.01

17  to 350 (Acne Monograph).  The Acne Monograph provides that an "over-the-counter acne drug

18  product…is generally recognized as safe and effective and is not misbranded" if "it meets each of

19  the conditions in this…chapter."  21 C.F.R. § 333.301.[1]  The Monograph expressly permits the use

20  of benzoyl peroxide ("BPO") as an active ingredient in products in an amount of 2.5 to 10 percent

21  and imposes labeling and warning requirements for products containing BPO.  *Id.* § 333.310.

22  Mandatory warnings are limited to:

23

24              (1) For products containing any ingredients identified in § 330.310.
                    (i) The labeling states "For external use only."
25                  (ii) The labeling states "When using this product [bullet] skin
                    irritation and dryness is more likely to occur if you use

26

27  ─────────────────
[1] *See* 75 Fed. Reg. 9767, 9770 (March 4, 2010) (FDA's "Topical Acne Drug Products for Over-
the-Counter Human Use; Final Rule") ("We, the Food and Drug Administration (FDA), are
28  issuing this final rule to include benzoyl peroxide as a generally recognized as safe and effective
(GRASE) active ingredient in over-the-counter (OTC) topical acne drug products.")

another topical acne medication at the same time. If irritation occurs, only use one topical acne medication at a time."
(2) For products containing sulfur identified in § 333.310(e) and (f).
    (i) The labeling states "Do not use on [bullet] broken skin [bullet] large areas of the skin."
    (ii) The labeling states "When using this product [bullet] apply only to areas with acne."
(3) For products containing any combination identified in § 333.320.
    (i) The labeling states "When using this product [bullet] rinse right away with water if it gets in eyes."
    (ii) The labeling states "Stop use and ask a doctor [bullet] if skin irritation occurs or gets worse."
(4) For products containing benzoyl peroxide identified in § 333.310(a).
    (i) The labeling states "Do not use if you [bullet] have very sensitive skin [bullet] are sensitive to benzoyl peroxide."
    (ii) The labeling states "When using this product [bullet] avoid unnecessary sun exposure and use a sunscreen [bullet] avoid contact with the eyes, lips, and mouth [bullet] avoid contact with hair and dyed fabrics, which may be bleached by this product [bullet] skin irritation may occur, characterized by redness, burning, itching, peeling, or possibly swelling. Irritation may be reduced by using the product less frequently or in a lower concentration."
    (iii) The labeling states "Stop use and ask a doctor if [bullet] irritation becomes severe."

21 C.F.R. § 333.350(c).

Moreover, OTC drugs are subject to federal current Good Manufacturing Practices ("cGMPs"). The federal cGMP regulations mandate compliance with standards for safety, identity, strength, quality, and purity. 21 U.S.C. § 351(a)(2)(B). Under § 351(a)(2)(B):

> A drug…shall be deemed to be **adulterated**…if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding **do not conform to** or are not operated or administered in conformity with **current good manufacturing practice** to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess;

21 U.S.C. § 351 (emphasis added). Conversely, it may be implied from this that if the drug conforms with the current good manufacturing practice, it is not "adulterated."

Certain states have adopted federal cGMP regulations in their respective equivalents of the federal Food, Drug, and Cosmetic Act ("FDCA"). For example, California's state equivalent is the Sherman Food, Drug, and Cosmetic Laws ("Sherman Law"). California Health & Safety Code § 110105 of the Sherman Law provides:

United States District Court
Northern District of California

> **All good manufacturing practices regulations** for any food, drug, device, or cosmetic and any amendments to the **regulations adopted pursuant to the federal act** in effect on November 23, 1970, or adopted on or after such date, **are the good manufacturing practices regulations of this state.** If the department finds that it is necessary for the protection of consumers, it may adopt interpretative regulations as necessary to define "current good manufacturing practice" as used in this part.

Cal. Health & Safety Code § 110105 (emphasis added).

**C.    Procedural Background**

On April 4, 2024, Plaintiffs filed their Complaint.  Dkt. 1.

During the parties' initial case management conference on September 17, 2024, the Court issued a stay on discovery.  Dkt. 45.

On October 25, 2024, Plaintiffs filed their First Amended Complaint ("FAC").  Dkt. 50. On March 14, 2025, Plaintiffs filed a motion for administrative relief, requesting limited discovery for the purpose of establishing subject matter jurisdiction.  Dkt. 60.

Before the Court is Defendants' motion to dismiss Plaintiffs' FAC.  Dkt. 51.

### III.    LEGAL STANDARD

**A.    Lack of Subject Matter Jurisdiction (Rule 12(b)(1))**

Under Rule 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction. Lack of such jurisdiction may occur where the plaintiff lacks standing; "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under [Rule] 12(b)(1)."  *Maya v. Centex Corp*., 658 F.3d 1060, 1067 (9th Cir. 2011).

The "irreducible constitutional minimum" of Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins* ("*Spokeo II*"), 136 S. Ct. 1540, 1547 (2016).  These three elements are referred to as, respectively, injury-in-fact, causation, and redressability.  *Planned Parenthood of Greater Was. & N. Idaho v. U.S. Dep't of Health & Human Servs*., 946 F.3d 1100, 1108 (9th Cir. 2020).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," which at the pleadings stage means "clearly . . . alleg[ing] facts demonstrating each

element." *Spokeo II,* 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

A Rule 12(b)(1) jurisdictional attack may be factual or facial. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack," "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the Court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

"[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1038. In resolving such an attack, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* Moreover, the Court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

Either way, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth*, 422 U.S. at 501; *see also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 882 (9th Cir. 2001) (in assessing standing, the Court may consider "the complaint and any other particularized allegations of fact in affidavits or in amendments to the complaint").

## B.     Failure to State a Claim (Rule 12(b)(6))

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th

1   Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the

2   pleadings in the light most favorable to the nonmoving party."  M*anzarek v. St. Paul Fire &*

3   *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not

4   simply recite the elements of a cause of action [and] must contain sufficient allegations of

5   underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

6   *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

7   990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

8   content that allows the court to draw the reasonable inference that the Defendant is liable for the

9   misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

10  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

11  unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

12                                  **IV.    <u>DISCUSSION</u>**

13  A.    <u>**Standing: Injury-in-Fact**</u>

14          Contrary to Defendants' argument, Plaintiffs have alleged facts sufficient to establish an

15  injury-in-fact for Article III standing because Plaintiffs allege economic harm.  *See* Mot. at 18; *see*

16  FAC ¶ 8 ("Plaintiff…lost money as a result of Defendants' improper conduct.").  To establish

17  Article III standing, plaintiffs must plead facts demonstrating an injury-in-fact.  *Spokeo, Inc. v.*

18  *Robins*, 578 U.S. 330, 340 (2016) ("*Spokeo I*").  "[P]alpable economic injuries have long been

19  recognized as sufficient to lay the basis for standing."  *Sierra Club v. Morton*, 405 U.S. 727, 733

20  (1972).  In fact, economic harm is "a quintessential injury-in-fact."  *Maya v. Centex Corp.*, 658

21  F.3d 1060, 1069 (9th Cir. 2011) ("[P]laintiffs [demonstrate] actual and concrete economic

22  injuries" when they claim that they "paid more for [goods] than the [goods] were worth" and

23  "claim that they would not have purchased [the goods] had defendants made the disclosures

24  allegedly required by law."); *see Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013)

25  ("[W]hen…Plaintiffs contend that class members paid more for a product than they otherwise

26  would have paid, or bought it when they otherwise would not have done so," there is "no

27  difficulty…regarding Article III injury in fact.").

28          Here, Plaintiffs allege that "[h]ad Defendants been truthful…about benzene in the BPO

United States District Court
Northern District of California

Products, or the risk that such Products would degrade into benzene, Plaintiffs…would not have bought the Products, or paid less for them."  FAC ¶ 128.  Thus, Plaintiffs plausibly allege that if they knew about the risk of benzene contamination, they would either have paid less for or not bought the BPO Products at all.  "[T]hese allegations outline a theory of economic injury that qualifies as an injury in fact under established Article III standing caselaw." *Bowen v. Energizer Holdings, Inc*., 118 F.4th 1134, 1146–47 (9th Cir. 2024) (holding that plaintiff alleged economic injury sufficient to establish Article III standing by alleging that had she "known that any amount of benzene was or risked being contained in…products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them").

Therefore, Plaintiffs adequately allege a cognizable injury-in-fact to support Article III standing.  Defendant's Rule 12(b)(1) motion is denied.

**B.    Federal Preemption**

Under the Supremacy Clause, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see also Oneok, Inc. v. Learjet, Inc*., 135 S.Ct. 1591, 1595 (2015).  Congress may exercise this power by expressly providing for preemption.  *Crosby*, 530 U.S. at 372.  Preemption need not, however, be express; it also occurs "[w]hen Congress intends federal law to occupy the field." *Id.*  Additionally, federal statutes will preempt state law that conflicts with federal law.  *Id.*  Conflict preemption can arise where it is impossible for a party to comply with both state and federal law (*see, e.g., Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)) or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (*citing Hines v. Davidowitz*, 312 U.S. 52, 66–67 (1941)).

Two presumptions regarding preemption guide the courts. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  First, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," because "the States are independent sovereigns in our federal system," *i.e.,* there is a starting presumption "that Congress does not cavalierly pre-empt state-law causes of action." *Id. See Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *New York State Conference of Blue Cross & Blue*

9

1   *Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55 (1995); *Astiana v. Hain Celestial Grp.,*

2   *Inc.*, 783 F.3d 753, 757 (2015).  Second, the "ultimate touchstone" in every preemption case is

3   Congressional purpose and intent.  *Medtronic*, 518 U.S. at 485.  "Congressional intent to preempt

4   state law must be clear and manifest."  *Indus. Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309

5   (9th Cir.1997).  *See United States v. Locke*, 529 U.S. 89, 108 (2000); *Astiana*, 783 F.3d at 757.

   **1.    <u>Benzene Warning on Label</u>**

7          The Federal Food, Drug, and Cosmetic Act ("FDCA") expressly preempts Plaintiffs'

8   claims that Defendants should have disclosed the presence or risk of benzene on their BPO

9   Product labels.  *See* FAC ¶ 7 ("Defendants are…liable to Plaintiffs…for misrepresenting and/or

10  failing to disclose or warn consumers that the BPO Products contain benzene and/or degrade to

11  form benzene.").

12         The FDCA, 21 U.S.C. § 301, *et. seq.*, establishes national uniform labeling requirements

13  for food, drugs, and cosmetics.  To preserve "[n]ational uniformity for nonprescription drugs" or

14  over-the-counter ("OTC") drugs, § 379r(a)(2) expressly prohibits any state from establishing "any

15  requirement" that "is different from or in addition to, or that is otherwise not identical with, a

16  requirement under this chapter."  21 U.S.C. § 379r.  A "requirement" includes "any requirement

17  relating to public information or any other form of public communication relating to a warning of

18  any kind for a drug."  *Id.* § 379r(c)(2).  Consequently, the FDCA preempts state law claims

19  imposing requirements that differ from those imposed by the FDCA.  *See Kroessler v. CVS Health*

20  *Corp.*, 977 F.3d 803, 808 (9th Cir. 2020) ("[P]rivate plaintiffs may bring only actions to enforce

21  violations of state laws imposing requirements **identical** to those contained in the FDCA.")

22  (emphasis added) (internal citation omitted).  "So if a product's label complies with the Act, then

23  the Act preempts any state-law claim that the product is mislabeled."  *Scheibe v. ProSupps USA,*

24  *LLC*, No. 23-3300, 2025 WL 1730272, at *3 (9th Cir. June 23, 2025).

25         "[T]o state a 'plausible' mislabeling claim that is not preempted, [Plaintiffs] must plead

26  facts that 'allow[] the court to draw the reasonable inference…that the [BPO Products are] not

27  only mislabeled under state law, but also misbranded under the [federal] Act."  *Id.* (citing *Iqbal*,

28  556 U.S. at 678).  "To establish its affirmative defense of preemption on a motion to dismiss,

United States District Court
Northern District of California

1  [Defendants] must show that [Plaintiffs'] complaint fails to support that inference." *Id.*

2  Defendants "may establish preemption if [they] prove[] that the [products'] labeling complies with

3  the Act." *Id.* at *5 (9th Cir. June 23, 2025).

4      Defendants have established preemption under § 379r(a) in the case at bar. Through their

5  state law claims, Plaintiffs seek to require a "supplemental statement on the [BPO Products']

6  label," "warning consumers about the presence of benzene in the Products." Opp'n at 1, 11; *see*

7  FAC ¶ 162. Section 379r(a) preempts Plaintiffs' state law claims because including a warning

8  about benzene and its risks would impose a requirement that is not "identical to those contained in

9  the FDCA." *Kroessler,* 977 F.3d at 808 (9th Cir. 2020). As stated, the Acne Monograph regulates

10  the BPO Products and clearly specifies the mandatory labeling requirements. *See* 21 C.F.R. §

11  333.350(c). Notably, none of these requirements impose a duty to include a warning about

12  benzene or its risks. Thus, the FDA specifically identifies the warnings that must be provided for

13  acne drugs containing BPO and these provisions impose no requirement to include warnings of

14  benzene or its risks. *See id.* §§ 333.310(c) and 333.350(c)(1)(i)-(ii), (c)(4)(i)-(iii). Plaintiffs have

15  not demonstrated that the BPO Products at issue fail to comply with the labeling requirements of

16  the FDCA. Plaintiffs instead seek to require warnings different from and additional to those

17  required by the FDCA, warnings not "identical to those contained in the FDCA." *Kroessler*, 977

18  F.3d at 808 ("[P]rivate plaintiffs may bring only actions to enforce violations of state laws

19  imposing requirements identical to those contained in the FDCA."). As such, FDCA § 379r(a)

20  preempts Plaintiffs' state law claims.

21      Many courts which have addressed the issue have held that § 379r(a) preempts consumer

22  claims seeking to mandate under state law disclosure of benzene or its risks. For example:

23  • *Howard v. Alchemee, LLC*, 2024 WL 4272931, at *10 (C.D. Cal. Sept. 19, 2024)

24      ("Plaintiffs seek to require Defendants to make disclosures not required under the FDCA

25      that would conflict with the FDA's conclusion that BPO is safe and effective. Because

26      Plaintiffs' claims would impose requirements that differ from and are in addition to those

27      in the FDCA, they are preempted under § 379r.");

28  • *O'Dea v. RB Health (US) LLC*, 2025 WL 1212835, at *7 (C.D. Cal. Apr. 22, 2025)

United States District Court
Northern District of California

("Because the FDCA and the FDA's regulations establish no…limit" on "selling acne medications containing more than 2 ppm of benzene," Plaintiffs' claims seek to impose a restriction that is "different from or in addition to, or that is otherwise not identical with" the requirements of the FDCA" and "[t]heir claims are therefore expressly preempted and must be dismissed.");

- *Smoter v. Mentholatum Co., Inc.*, 2025 WL 273437, at *2 (N.D. Ill. Jan. 17, 2025) ("[T]o the extent the plaintiffs argue the labels of the OXY products should have warned them of the possibility of benzene or included benzene as an ingredient, these claims are preempted by federal law and must fail.");

- *Bodunde v. Walgreens Boots All., Inc.*, 2025 WL 1411306, at *12 (E.D. Cal. May 15, 2025) ("[T]o the extent Plaintiff's claims are based on allegations that Walgreens should have warned about the presence of benzene on Walgreen's BPO product labels, that theory is expressly preempted because it would be an addition not required by federal law.") (internal citation omitted);

- *Eisman v. Johnson & Johnson Consumer, Inc.*, 2025 WL 241024, at *4 (C.D. Cal. Jan. 17, 2025) ("Whether Eisman's theory of liability is that the presence of benzene requires a disclosure that Defendants omit, or that it renders the Products adulterated and misbranded, each of his claims seeks to impose requirements that are 'different from or in addition to, or that are otherwise not identical with the FDA's.") (internal citation omitted).

These rulings are hardly surprising because a ruling otherwise would allow state-mandated labels to contradict the FDA's determination that BPO is safe and effective.[2] *See Silva v. Haleon US Inc.*, 758 F. Supp. 3d 1082, 1088 (N.D. Cal. 2024) ("With respect to the labeling of over-the-counter ("OTC") drugs, 'the whole point of section 379r is that it is not up to private litigants—or judges—to decide what is 'false or misleading.' It is up to the FDA.'") (citing *Eckler v. Neutrogena Corp.*, 238 Cal. App. 4th 433, 454 (Cal. Ct. App. 2015)) (finding that § 379r(a)

---

[2] Plaintiffs may consult the FDA to change the labeling or seek disapproval of the BPO Products. However, Plaintiffs cannot bring suit under state law to impose requirements that differ from federal regulations in violation of § 379r(a).

preempted plaintiffs' claims).

Plaintiffs offer no caselaw demonstrating otherwise. In *Ebner v. Fresh, Inc.*, the Ninth Circuit held that § 379r(a) did not preempt the plaintiff's claim regarding a cosmetic product because the plaintiff sought to enforce a law "identical to [the] federal duty under the FDCA: the duty to avoid false or misleading labeling." 838 F.3d 958, 965 (9th Cir. 2016).

Plaintiffs' reliance on *Astiana v. Hain Celestial Grp., Inc.* is similarly misplaced. There, the Ninth Circuit held that the FDCA did "not expressly preempt state causes of action predicated on federal cosmetics labeling laws" because "the FDA did not intend to permit indiscriminate use of the word 'natural' on cosmetics labels." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 758 (9th Cir. 2015). But, there is no indication that the cosmetic products at issue in *Astiana* were subject to an FDA monograph. As *Astiana* noted, the FDA had never issued regulations regarding the use of the term 'natural' on cosmetic labels. Again, the BPO Products at issue here *are* subject to the FDA's Acne Monograph which specifies in detail by regulation the required warnings. Thus, *Astiana* is readily distinguishable.

This Court joins its sister courts in holding that the FDCA preempts Plaintiffs' state law claims which challenge the omission of warnings on BPO products that are different from and not required by the FDCA and which assert that that the BPO products are not safe and effective as found by the FDCA regulations.

### 2.    cGMP Violations

Next, Plaintiffs assert state law claims that Defendants failed to comply with federal cGMPs and adulteration standards which are incorporated by reference in state regulations. *See* FAC ¶ 70.

### a.    Some Parallel Claims May Proceed

As noted above, "private plaintiffs may bring only actions to enforce violations of state laws imposing requirements **identical** to those contained in the FDCA." *Kroessler,* 977 F.3d at 808 (emphasis added); *see* 21 U.S.C. § 379r (expressly prohibiting any state from establishing "any requirement" that "is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter"). Accordingly, a plaintiff may bring state law claims for

United States District Court
Northern District of California

violations of federal standards adopted in state regulations where "the state requirements at issue are identical to their federal counterparts." *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 845-50 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1922 (2025) (finding that a California Sherman Law claim was "expressly permitted" and "not expressly preempted" because the Sherman Law statute incorporated federal regulations by reference and thus enforced a requirement identical to federal standards).

Here, Plaintiffs allege that Defendants violated state regulations incorporating federal cGMPs and adulteration standards by reference. FAC ¶ 70.[3] Specifically, Plaintiffs allege that the "BPO Products" are "contaminated and/or adulterated with benzene," which "indicates that there was a critical failure in Defendants' quality control and testing protocols as required by [federal] cGMPs." *Id.* Plaintiffs provide a long list of thirty-seven state statutes that purport to mirror the FDCA. *Id.* ¶ 59. The Court takes the California statute as an example.[4] Like the California food labeling regulation at issue in *Sprout*, the California good manufacturing practices regulation incorporates federal regulations by reference:

> All good manufacturing practices regulations for any food, drug, device, or cosmetic and any amendments to the regulations adopted pursuant to the federal act in effect on November 23, 1970, or

---

[3] "[S]tate…laws impose an independent duty on drug manufacturers to ensure that end purchasers receive drugs that are made in accordance with cGMPs. This duty emanates from each state's adoption or adherence to federal cGMP and adulteration standards, including…parallel state statutes." The fact that there is no federal private right of action under the FDCA (21 U.S.C. § 337(a)) therefore does not preclude a state from providing a cause of action for violation of its laws provided the state law is not preempted by the FDCA. *See Sprout*, 106 F.4th at 849 ("This case fundamentally differs from *Buckman*, *Perez*, and *Nexus*" because "plaintiffs are claiming violations of California law, the Sherman Law, not the federal FDCA" and "Congress said" that "standards…identical to the federal standards…are not preempted and hence permitted states to adopt them…There is no reason we can perceive why Congress would permit states to enact particular legislation and then deny enforcement by their citizens.").

[4] Plaintiffs cite to California Health and Safety Code § 111260, which provides that a "drug…is adulterated if the methods, facilities, or controls used for its manufacture, processing, packing, or holding do not conform to, or are not operated or administered in **conformity with current good manufacturing practice** to assure that the drug or device meets the requirements of this part as to safety and has the identity and strength, and meets the quality and purity characteristics that it purports or is represented to possess." FAC ¶ 59; Cal. Health & Safety Code § 111260 (emphasis added). As specified, the state's good manufacturing practices derive from those in the FDCA. *See* Cal. Health & Safety Code § 110105.

> adopted on or after such date, are the good manufacturing practices regulations of this state.

Cal. Health & Safety Code § 110105.  Because the California regulation incorporates federal requirements by reference, the California law is identical to the federal requirement on cGMPs. *Sprout*, 106 F.4th at 848.  Accordingly, like in *Sprout*, claims under state laws enforcing "standards…identical to the federal standards" are thus not *prima facie* preempted.  *Id.* at 849.  *See Navarro v. Walgreens Boots All., Inc*., 2025 WL 1411406, at *14 (E.D. Cal. May 15, 2025) ("[T]o the extent Plaintiffs' state law claims are parallel claims brought for violations of cGMPs, those claims are not categorically preempted.").

### b.   <u>Claims that Require Interpretation of the FDCA are Impliedly Preempted</u>

However, if Plaintiffs' state law claims based on cGMP violations require the Court to interpret the FDCA and regulations thereunder, these claims will be impliedly preempted.   As noted above, implied preemption ("obstruction preemption") arises where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 373 (citing *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Id.*

Here, Plaintiffs' claim based on asserted violations of the cGMPs appears to obstruct the accomplishment and execution of Congress's objectives of: (1) delegating the specifics of generating and enforcing good manufacturing practices to the FDCA which has the expertise to do so, and (2) ensuring national uniformity in the quality of manufacturing of nonprescription drugs.

### i.   <u>Objectives at Issue</u>

Two federal objectives are at issue here: 1) preserving national uniformity of nonprescription drugs, and 2) deference to the FDA's expertise in realizing the former objective.

The FDCA provides mechanisms to accomplish both objectives.  First, Section 379r enables preservation of national uniformity by expressly preempting state requirements that are not identical to federal law.

15

Second, Section 337(a) bars private enforcement of the FDCA, which empowers the FDA to determine when a violation of the FDCA has occurred.  Section 337(a) of the FDCA vests exclusive enforcement authority in the United States.  Section 337(a) provides that "all such proceedings for the enforcement, or to restrain violations, of [the Act] shall be by and in the name of the United States."  21 U.S.C. § 337(a).  The Supreme Court has held that § 337(a) is "clear evidence that Congress intended that the [FDCA] be enforced exclusively by the Federal Government."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001) (finding that the FDCA impliedly preempted private plaintiffs' state law claims to police fraud on the FDA).  Thus, "'[b]ecause the FDCA forbids private rights of action under that statute, a private action brought under [other laws] may not be pursued when…the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation.'"  *Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1049 (9th Cir. 2022) (citing *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010)).  While the FDCA allows for the private enforcement of state law identical to the federal law, Congress vested exclusive enforcement of the FDCA in the FDA – thereby ensuring national uniformity and delegating exclusive enforcement to the FDA which has technical expertise in the field.

Third, Congress enacted laws authorizing the FDA to issue regulations for the efficient enforcement of the FDCA, including cGMP regulations, (21 U.S.C. § 371(a)), establishing the federal cGMP regulations (21 U.S.C. § 351(a)(2)(B)), and empowering the FDA with several enforcement mechanisms such as injunctions (21 U.S.C. § 332), penalties (21 U.S.C. § 333), and seizure (21 U.S.C. § 334).

### ii.    Discussion

Here the long list of cGMPs assertedly violated would appear to require a substantial amount of interpretation.  The cGMP requirements asserted herein are extremely general. [5]  Below are three examples from cGMP violations in Plaintiffs' complaint and why adjudicating the claim

---

[5] The ambiguity is logical as the cGMP regulations must be general enough to encompass differences among drugs.

1  would appear to require the trier of fact to interpret the regulation.

2      Plaintiffs allege a violation of the federal cGMP regulation on testing and release for

3  distribution.  FAC ¶ 68(i); *see* 21 C.F.R. § 211.165(a).  This cGMP regulation provides:

> For each batch of drug product, there shall be **appropriate** laboratory determination of **satisfactory conformance** to final specifications for the drug product, including the identity and strength of each active ingredient, prior to release. **Where sterility and/or pyrogen testing** are conducted on specific batches of shortlived radiopharmaceuticals, such batches may be released prior to completion of sterility and/or pyrogen testing, provided such testing is completed **as soon as possible**.

9  21 C.F.R. § 211.165(a) (emphasis added).  When is a laboratory determination "appropriate," such

10 that a manufacturer can be said to have complied with § 211.165(a)?  What constitutes

11 "satisfactory conformance"?  What kind of "sterility testing" is adequate?  How quick is

12 "as soon as possible"?  Would the answers depend on the kind of drug at issue?  At different times

13 in the drug's life cycle?

14     Plaintiffs allege a violation of the federal cGMP regulation on retesting of approved

15 components, drug product containers, and closures.  FAC ¶ 68(o); *see* 21 C.F.R. § 211.87.  This

16 regulation provides:

> Components, drug product containers, and closures shall be retested or reexamined, as **appropriate**, for identity, strength, quality, and purity and approved or rejected by the **quality control unit in accordance with § 211.84 as necessary**, e.g., after storage for **long periods** or after exposure to air, **heat** or other conditions that **might adversely affect the component**, drug product container, or closure.

22 21 C.F.R. § 211.87 (emphasis added).  When is it "appropriate" or "necessary" to retest or

23 reexamine, such that the manufacturer has complied with § 211.87?  What constitutes an adequate

24 "quality control unit"?  What is a "long Period," what temperature range constitutes "heat," and

25 how substantial must the effect be to be something that "might adversely affect the component"?

26 Again, would the answers vary from drug to drug?

27     Plaintiffs allege a violation of the federal cGMP regulation on production record review.

28 FAC ¶ 68(l); *see* 21 C.F.R. § 211.192.  This regulation provides:

> All drug product production and control records, including those for packaging and labeling, shall be **reviewed and approved** by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed. Any unexplained discrepancy (including a percentage of theoretical yield exceeding the maximum or minimum percentages established in master production and control records) or the failure of a batch or any of its components to meet any of its specifications shall be **thoroughly investigated**, whether or not the batch has already been distributed. The investigation shall extend to other batches of the same drug product and other drug products that **may have been associated with the specific failure or discrepancy**. A written record of the investigation shall be made and shall include the conclusions and followup.

21 C.F.R. § 211.192 (emphasis added).  What constitutes a "thorough" investigation, such that a manufacturer can be said to have complied with § 211.87?  What process of "review and approval" is sufficient?  How does one determine which drugs "may have been associated with the specific failure" and what degree of probability should be applied?  Again, the answers would seem to depend, *inter alia*, on the drug at issue.

As illustrated above, the cGMP-based claims likely require statutory interpretation which may be specific to a particular drug and circumstance.  Allowing courts from around the nation to render interpretations on such a broad slate risks a threat to national uniformity in the quality standards applied to the manufacturing of nonprescription drugs.  It would also intrude on Congress's delegation of the exclusive enforcement authority to the FDA (21 U.S.C. § 337(a)) which has the expertise to oversee the quality of manufacture of nonprescription drugs through its application and enforcement of the cGMPs and applicable regulations.  Permitting local state and federal courts – through the vehicle of state law incorporating these federal standards – to render varying interpretations of highly general provisions of federal law and regulations threatens to frustrate the national uniformity Congress enforced by the FDA as intended for nonprescription drugs (21 U.S.C. § 379r).  Thus, Plaintiffs' cGMP-related claims may be impliedly preempted.

By way of contrast, the claim in *Sprout* involved an application of federal law (through a parallel state law) which did *not* require interpretation of a broad federal law.  The plaintiff in *Sprout* alleged a violation of a Sherman Law statute which enforced a wholesale prohibition on placing nutrient content claims on the front of a baby food package.  *See Sprout*, 106 F.4th at 848

18

(Defendant "nevertheless produced pouches of baby food with labels on the front of the package," in direct violation of the FDA's labeling standard). The violation in *Sprout* was categorical: the defendant either produced pouches of baby food **with** nutrient content claims on the front (in violation of federal law), or it produced pouches of baby food **without** nutrient content claims on the front. Thus, the court was not required to interpret the regulation at issue. The answer was a clear and simple binary choice. Without the need for interpretation and the attendant risk of variation in that interpretation, allowing the Sherman Law claim to proceed in *Sprout* did not obstruct the accomplishment of the dual objectives of preserving national uniformity and deferring to the FDA's expertise.

As pled, it is impossible to decipher whether Plaintiffs' state-law theory on cGMP violations involves only binary determinations as in *Sprout* or, more likely, requires statutory interpretation. Thus, at this stage, that question cannot be determined and so the Court allows Plaintiffs' cGMP-based claims to proceed. However, the Plaintiff must be mindful of the high risk of implied preemption if interpretation of the cGMPs is required.

## C.    <u>Failure to State a Claim</u>

While Plaintiff's cGMP-based claims survive preemption, these claims are likely to be dismissed because Plaintiffs fail to 1) adequately allege that the state statutes enforce requirements that are identical to federal standards (*i.e.* parallelism), and 2) allege with specificity how Defendant has violated each cGMP requirement identified in Plaintiffs' complaint, specificity necessary not only as a matter of fair notice to the defendant and to meet the pleading standard of Rule 9 but also to determine whether the claims are preempted.

### 1.    <u>Parallel Requirements</u>

First, Plaintiffs fail to allege with specificity that the state statutes in Plaintiffs' list impose requirements that are "parallel…to federal requirements," *i.e.* identical to those imposed by federal law. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008) (internal citation omitted). Plaintiffs provide a laundry list of state statutes without demonstrating that these state regulations actually impose requirements identical to federal ones. The Court notes that certain appear to merely bar the sale of 'adulterated' drugs and do not incorporate, as does California law, the federal law. *See*

United States District Court
Northern District of California

1   35 Pa. Stat. § 780-113(a)(1); Ga. Code § 26-3-3(1).  Plaintiffs have failed adequately to allege

2   with specificity parallelism of each state law asserted.

3           **2.    cGMP Violations**

4           Second, Plaintiffs' allegations regarding Defendants' cGMP violations fail to provide

5   "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to

6   defend itself effectively" as required by Rule 8 and fail to allege with sufficient detail how

7   Plaintiffs were deceived as required to assert fraud under Rule 9.  *Levitt*, 765 F.3d at 1135;

8   *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) (Under

9   Rule 9(b), "a pleader of fraud" must "detail with particularity the time, place, and manner of each

10  act of fraud, plus the role of each defendant in each scheme.").

11          In particular, Plaintiffs list twenty-one cGMP requirements and portions of the regulatory

12  language of each.  FAC ¶ 68.  Plaintiffs allege that Defendants' BPO Products "did not conform to

13  its final monograph specifications . . . which demonstrates inadequate production, process, and

14  quality oversight by Defendants."  *Id.* at ¶ 69.  Then, Plaintiffs allege that Defendants failure to

15  conform to the cGMP requirements demonstrates a "critical failure in Defendants' quality control

16  and testing protocols as required by the above-referenced cGMPs."  *Id.* at ¶ 70.  Such a "critical

17  failure" in Defendants' oversight led to the "production, and ultimate sale to consumers, of BPO

18  Products" that were contaminated with benzene.  *Id.*  In other words, Plaintiffs allege that

19  Defendants *must have* violated one of, if not all of, the twenty-one cGMP standards that they list

20  simply because benzene-contaminated BPO Products were allowed to enter the marketplace.

21  However, Plaintiffs do not assert *how* Defendants violated or deviated from specific cGMP

22  standards and *how* such deviations led to the adulteration of its BPO Products.  Because of the

23  lack of specificity, the complaint fails to state claims based on state law under Rule 12(b)(6).

24  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556.

25          Moreover, to the extent Plaintiffs assert an omission theory of consumer fraud for omitting

26  or concealing that the BPO Products contained or degraded to contain benzene, Plaintiffs'

27  allegations fail to meet the pleading standard of Federal Rule of Civil Procedure 9(b).  One

28  asserting a "fraudulent concealment suit will 'not be able to specify the time, place, and specific

20

content of an omission as precisely as would a plaintiff in a false representation claim'" because "a plaintiff…alleging a failure to act instead of an affirmative act…cannot point out the specific moment when the defendant failed to act." *Baggett v. Hewlett-Packard Co*., 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007) (citing *Falk v. General Motors Corporation*, 496 F.Supp.2d 1088, 1098–99 (N.D. Cal.2007). Thus, "a fraud by omission or fraud by concealment claim '"can succeed without the same level of specificity required by a normal fraud claim.'" *Id.* Nonetheless assertions of omissions cannot be conclusory. Here, Plaintiffs have not alleged facts demonstrating how Defendants violated cGMPs or adulteration standards or how these alleged deviations deceived Plaintiffs (or the consuming public) in any consequential way. Plaintiffs' allegation that "had Defendants adequately tested their BPO Products for benzene, they would have discovered that the Products contained benzene" is too conclusory. FAC ¶ 99.

Finally, greater specificity as to how the cGMPs were violated is necessary to determine whether the alleged violation(s) require interpretation of the cGMP requirements which would implicate implied preemption. Again, theories that require interpretation of the cGMPs rather than a clear binary determination as in *Sprout* would be impliedly preempted.

The Court is inclined to grant Defendants' motion to dismiss. *See Ebrahimi v. Mentor Worldwide LLC*, 804 F. App'x 871, 872 (9th Cir. 2020) (affirming district court's Rule 12(b)(6) dismissal where a plaintiff "essentially contend[ed] that the court can plausibly infer that [a defendant] must have violated at least one of the FDA's CGMPs by not catching her allegedly defective [product]" because "mere allegations suggesting that [the plaintiff's] particular [products] were defective do not show that [the defendant] failed to comply with the FDA's Current Good Manufacturing Practices.") (internal citation omitted); *see also Weber v. Allergan, Inc*., 940 F.3d 1106, 1114 (9th Cir. 2019 (affirming district court's grant of summary judgment for defendant where "mere evidence suggesting that [the plaintiff's] particular [product] was defective does not show that [the defendant] failed to comply with the FDA's Current Good Manufacturing Practices" and "evidence that some other [products] produced by [the defendant] were defective does not demonstrate noncompliance.").

# V.     CONCLUSION

Although the Court is inclined to grant Defendants' motion to dismiss, it will permit Plaintiffs to amend their complaint to allege with specificity the parallel state laws it asserts and specific facts establishing Defendants' violations of particular cGMPs and how such violations rendered the BPO Products adulterated, provided that those asserted violations are limited to those which can be proven without interpretation of the cGMPs.

The Court will stay the current motion to dismiss and lift the stay on discovery to permit Plaintiffs the opportunity to conduct limited and focused discovery on the alleged cGMP violations. Such discovery will be limited to written discovery designed to determine whether the cGMPs were violated in a manner that does not require interpretation or scientific/technical judgment, *i.e.* violations provable in a manner similar to that in *Sprout*. Plaintiffs shall have 60 days to conduct such limited and focused written discovery and file any amended complaint consistent with their Rule 11 obligations. Failure to timely file an amended complaint will result in dismissal of this case with prejudice for the reasons stated herein.

**IT IS SO ORDERED**.

Dated: August 6, 2025

_____
EDWARD M. CHEN
United States District Judge