United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LINDSEY DAUGHERTY, et al.,

Plaintiffs,

v.

PADAGIS US LLC, et al.,

Defendants.

Case No. 24-cv-02066-EMC

**ORDER GRANTING MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Docket No. 88

## I. INTRODUCTION

Plaintiffs bring a putative class action against Defendants, alleging that over-the-counter acne products containing benzoyl peroxide ("BPO") can degrade to form benzene, a known carcinogen, and that Defendants failed to test for or disclose that risk. Second Amended Complaint ("SAC") (Dkt. 85). Plaintiffs seek purely economic damages on behalf of the multi-state consumer classes on the theory that they would not have purchased, or would have paid less for, certain BPO Products had they known of the benzene risk. SAC ¶¶ 12, 215.

The Court previously held that Plaintiffs' claims, premised on Defendants' failure to warn of benzene on its product labels, were expressly preempted, but that claims alleging violations of federal current Good Manufacturing Practice regulations ("cGMPs"), to the extent they were incorporated into parallel state statutes, were not categorically preempted. In August 2025, the Court deferred a ruling on the first motion to dismiss and stayed the first motion to dismiss. It granted limited written discovery, and directed Plaintiffs to file an amended complaint alleging, with specificity, violations of cGMPs provable without the need for statutory or scientific interpretation, and to identify state statutes imposing requirements identical to those federal

standards. Order Deferring Ruling on MTD ("MTD Order") (Dkt. 72).

Plaintiffs' warning-based claims remain expressly preempted for the reasons stated in the Court's August 6, 2025 Order. This Court held that because § 379r(a)(2) expressly prohibits any state from establishing "any requirement" that "is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter," and § 379r(c)(2) defines "requirement" as "any requirement relating to public information or any other form of public communication *relating to a warning of any kind for a drug*," the FDCA preempts state law claims imposing requirements that differ from those imposed by the FDCA." MTD at 10 (emphasis added). Thus, "Section 379r(a) preempts Plaintiffs' state law claims because including a warning about benzene and its risks would impose a requirement that is not' identical to those contained in the FDCA.'" MTD Order at 11. The amended complaint does not cure the preemption deficiency identified in that Order.

The amended complaint also does not cure parallelism hurdles identified in this Court's August 2025 Order as to Plaintiffs' cGMP violation claims. As this Court previously explained, a state law claim may survive express preemption if it "impose[s] requirements identical to federal ones." MTD Order at 19 (citing 21 U.S.C. § 379r(a)(2)). Where the state law has adopted regulations identical to the federal requirement on cGMPs, the parallel claims may proceed. MTD Order at 13. The Court concluded that some, but not all, parallel cGMP claims may proceed. *Id.* at 13–14.

For those cGMP claims *not* expressly preempted, the Court stayed dismissal and lifted the stay on discovery pending Plaintiffs' amended complaint alleging "with specificity the parallel state laws it asserts and specific facts establishing Defendants' violations of particular cGMPs and how such violations rendered the BPO Products adulterated, provided that those asserted violations are limited to those which can be proven without interpretation of the cGMPs." *Id.* at 22. At the time, the Court concluded that "[a]s pled, it [was] impossible to decipher whether Plaintiffs' state-law theory on cGMP violations involves only binary determinations as in *Sprout* or, more likely, requires statutory interpretation." MTD Order at 19.

Plaintiffs have now had the opportunity to amend their complaint. As discussed below, the

Court concludes that Plaintiffs' cGMP claims are impliedly preempted. Determining whether the cGMPs required BPO Product manufacturers to test for benzene is a matter of scientific and technical interpretation reserved for the FDA and requires interpretation of federal standards. It is not a simple or "plain" question escaping implied preemption under *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842 (9th Cir. 2024); *see also Bubak v. Golo, LLC*, 2025 WL 2860044, at *2 (9th Cir. Oct. 9, 2025) (mem.) (labeling the question in *Sprout* as "plain" and thus not impliedly preempted). As to Plaintiffs' attempt to assert new theories in its second amended complaint, these theories exceed the scope of Plaintiffs' leave to amend, and, in any event, fail on the merits.

Accordingly, for these reasons as described below, the Court **GRANTS** Defendants' motions to dismiss.

## II. <u>BACKGROUND & PROCEDURAL HISTORY</u>

### A. <u>Factual Background & Regulatory Framework</u>

This putative consumer class action involves over-the-counter ("OTC") acne treatment products containing the active ingredient benzoyl peroxide ("BPO Products"). Benzoyl peroxide can degrade into the carcinogen benzene during distribution and storage. Plaintiffs allege that Defendants knew of the risk of benzene contamination, failed to test for benzene in its products, and failed to warn consumers of the contamination risk in violation of various state laws.

The Food and Drug Administration ("FDA") regulates OTC drugs and issues monographs that establish conditions under which an OTC drug is generally recognized as safe and effective for its intended use. *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013) ("Like a recipe, each monograph sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs and provides the conditions under which each active ingredient is [generally recognized as safe and effective]."). The monographs have legal effect. "Any product [that] fails to conform to each of the conditions contained in … an applicable monograph is liable to regulatory action." 21 C.F.R. § 330.1.

The FDA's Acne Monograph regulates Defendants' BPO Products. SAC ¶ 54. The Acne Monograph is codified at 21 C.F.R. § 333.301, *et seq. See* 21 C.F.R. §§ 333.301–333.350 (Acne Monograph). The Acne Monograph provides that an "over-the-counter acne drug product . . . is

United States District Court
Northern District of California

generally recognized as safe and effective and is not misbranded" if "it meets each of the conditions in this . . . chapter." 21 C.F.R. § 333.301. The Acne Monograph expressly permits BPO as an active ingredient in products between 2.5 and 10 percent, and imposes labeling and warning requirements for products containing BPO. *Id.* § 333.310. Critically, the monograph does not mandate that companies test for benzene or warn about potential benzene contamination. *See id.* §§ 333.301–333.350 (Acne Monograph).

OTC drugs are also subject to federal cGMPs (current Good Manufacturing Practice regulations). The federal cGMP regulations mandate compliance with certain manufacturing, processing, and storage guidelines. 21 U.S.C. § 351(a)(2)(B). Under § 351(a)(2)(B):

> A drug…shall be deemed to be **adulterated**…if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding **do not conform to** or are not operated or administered in conformity with **current good manufacturing practice** to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]

21 U.S.C. § 351(a)(2)(B) (emphases added).

Certain states have incorporated the federal cGMP regulations in their respective statutory equivalents of the federal Food, Drug, and Cosmetic Act ("FDCA"). For example, California's state equivalent is the Sherman Food, Drug, and Cosmetic Laws ("Sherman Law"). Section 110105 of the Sherman Law provides:

> **All good manufacturing practices regulations** for any food, drug, device, or cosmetic and any amendments to the **regulations adopted pursuant to the federal act** in effect on November 23, 1970, or adopted on or after such date, **are the good manufacturing practices regulations of this state.** If the department finds that it is necessary for the protection of consumers, it may adopt interpretative regulations as necessary to define "current good manufacturing practice" as used in this part.

Cal. Health & Safety Code § 110105 (emphases added).

Most states, however, do not have a provision expressly incorporating federal cGMP regulations in a similar manner. *See, e.g.*, Mo. Rev. Stat. § 196.095(5); Mont. Code § 50-31-305(3). The lack of incorporation of federal standards is critical to the express preemption analysis, as explained in further detail below.

The FDA is aware of the threat of benzene contamination in pharmaceutical and cosmetic products, and has actively investigated benzene levels on numerous instances. In December 2021 the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson after testing revealed benzene levels ranging from 11.2 to 23.6 ppm in the manufacturer's aerosol sunscreen products. SAC ¶ 32.

In December 2023, the FDA issued an alert on its website directing certain drug manufacturers (not limited to acne medication) "with a risk for benzene contamination" to test their products for benzene:

> Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.]… If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]

SAC ¶ 33.

In March 2025, the FDA announced a voluntary recall of specific BPO Products for elevated levels of benzene. U.S. Food & Drug Admin., *Limited Number of Voluntary Recalls Initiated After FDA Testing of Acne Products for Benzene; Findings Show a Small Number of Products With Elevated Levels of Benzene Contamination* (Mar. 11, 2025), https://www.fda.gov/drugs/drug-safety-and-availability/limited-number-voluntary-recalls-initiated-after-fda-testing-acne-products-benzene-findings-show. None of the defendants in this action were implicated. *See id.*

In October 2025, the FDA issued a warning letter to a non-party manufacturer, Owen Biosciences, Inc., after detecting more than 20 ppm of benzene in one lot of the company's BPO acne treatment product. SAC ¶ 76. Again, Defendants were not subjects of the warning letter.

Despite these investigatory and enforcement actions, the FDA has not amended its Acne Monograph to specifically require manufacturers to test for benzene or provide product warnings regarding the risk of benzene contamination. Because the Ninth Circuit has specifically held that FDA alerts of this kind are non-binding and therefore not a source of law to which a court conducting a preemption analysis should defer, this Court declines to consider these FDA alerts as

United States District Court
Northern District of California

in effect amendments to the Acne Monograph. *See Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1148 n.12 (9th Cir. 2024).

B. Procedural History

This case is before the Court for a second motion to dismiss. In August 2025, the Court stayed the pending motion to dismiss and granted Plaintiffs leave to conduct limited discovery and to file a second amended complaint. MTD Order. That Order sets forth the framework for the present motion.

***Express Preemption.*** The Court found that Plaintiffs' failure to warn claims were expressly preempted. The Court's ruling on express preemption centered on 21 U.S.C. § 379r, which states, in relevant part:

> (a) Except as provided in subsection (b), (c)(1), (d), (e), or (f), no State or political subdivision of a State may establish or continue in effect any requirement —
>
> . . .
>
> (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter, . . . .

21 U.S.C. § 379r(a)(2).

This Court held that § 379r(a)(2) of the FDCA expressly preempts state law claims seeking to compel Defendants to disclose the presence or risk of benzene on their product labels, disclosures which are not required by federal law. MTD Order at 10–13 ("This Court joins its sister courts in holding that the FDCA expressly preempts Plaintiffs' state law claims which challenge the omission of warnings on BPO products that are different from and not required by the FDCA and which assert that the BPO products are not safe and effective as found by the FDCA regulations.").

***State Law Parallelism.*** The Court acknowledged that state statutes that impose requirements *identical* to federal ones are not preempted. Nonetheless, the Court identified a related deficiency in the complaint: Plaintiffs' list of state statutes under which they sued were too conclusory. Plaintiffs failed to show that the state statutes actually "impose requirements identical to federal ones." MTD Order at 19. The Court observed that certain cited statutes "appear to

merely bar the sale of 'adulterated' drugs and do not incorporate, . . . the federal law." *Id.* at 19–20. A state statute that imposes requirements different from and not identical to the relevant federal standard is expressly preempted under § 379r(a). Because the prior complaint did not establish that the cited state statutes met that standard, the Court granted leave for Plaintiffs to amend their complaint to "allege with specificity" the parallel state laws on which they rely and which they contend impose requirements identical to those under federal law. *Id.* at 22.

***Implied Preemption of cGMP-Based Claims.*** The Court also addressed Plaintiffs' claims asserting that Defendants failed to comply with cGMPs. It held that Plaintiffs' complaint, as then pleaded, was too conclusory to determine whether those claims would require statutory interpretation of the cGMPs. If Plaintiffs' claims required interpretation of cGMPs, they would be impliedly preempted because they would not present merely "plain" questions and answers warranting a "simple binary choice," which would escape implied preemption under *Sprout*, 106 F.4th at 848. MTD Order at 18–20. In contrast, claims that require an interpretation of federal cGMP standards, and which could result in ruling(s) at variance with the FDA's interpretation of those standards, are, impliedly preempted.

In particular, Section 337(a) vests exclusive enforcement authority in the federal government, barring private suits to enforce the FDCA. 21 U.S.C. § 337(a). Together with § 379r(a), the statutory provisions establish an extremely narrow path for suits like this one brought under state law. A plaintiff may pursue parallel state law claims to enforce standards identical to federal standards, but only if doing so would not require a court to interpret and apply the federal standards. *Sprout*, 106 F.4th at 848. That interpretive function falls within the province of the FDA and not the courts. *See Nexus Pharms., Inc. v. Cent. Admixture Pharm. Servs., Inc.*, 48 F.4th 1040, 1048–50 (9th Cir. 2022) ("The statutory prohibition on private enforcement gives the FDA discretion to temper enforcement or not to enforce in circumstances it deems appropriate. If state law facilitates enforcement beyond what the FDA has deemed appropriate, then state law claims may indeed 'stand as an obstacle' to FDA's enforcement discretion by enabling what the FDA regards as over-enforcement."); *Bubak*, 2025 WL 2860044, at *2 ("As in *Nexus*, further analysis is needed to determine whether [Defendant's] marketing actually violated the FDCA. Because the



United States District Court
Northern District of California

United States District Court
Northern District of California

FDCA preempts private suits seeking judicial resolution of such questions, the claim is preempted."). When a court must interpret federal standards to determine whether they were violated or not, *e.g.*, by applying scientific or technical judgment that Congress committed to the FDA, the state law claim "stands as an obstacle" to Congress's purposes and is impliedly preempted. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). It cedes ground exclusively occupied by the FDA. It could also result in variations in interpretation among states – upsetting national uniformity which obtains as a result of exclusivity of FDA interpretations. On the other hand, as *Sprout* demonstrates, a simple application of a standard that presents a plain binary choice and does not call for interpretation does not stand as an obstacle and is not implied preempted – in such instance, there can be only one interpretation, risking no variances from an FDA interpretation.

Shortly after the Court's August 2025 Order deferring a ruling on the motion to dismiss, the Ninth Circuit underscored the *Sprout* reasoning in *Bubak*, No. 24-492, 2025 WL 2860044 (9th Cir. Oct. 9, 2025) (mem.). There, the panel affirmed dismissal of a state law claim brought under California's Sherman Law, which incorporates the FDCA's dietary supplement labeling rules. Although the state law was formally "identical" to federal law, the Ninth Circuit held that the claim was impliedly preempted because determining whether the defendant's marketing actually violated the FDCA required "further analysis" of federal standards. *Id.* at *2. The panel explicitly distinguished *Sprout* on this ground: in *Sprout*, the violation was "plain" because the regulation on its face prohibited nutrient content claims on baby food packaging, presenting a simple "yes" or "no" question. *Id.* (citing *Sprout*, 106 F.4th at 849). But if "further analysis is needed" to determine whether federal law was violated, that determination belongs exclusively with the FDA and not a court adjudicating a state law claim. *Id.*

Though not binding precedent, *Bubak* is entirely consistent with this Court's August 2025 holding. So are decisions from another district court. The Central District of California recently applied *Sprout* framework to nearly-identical BPO claims and dismissed them on implied preemption grounds. *O'Dea v. RB Health (US) LLC*, 779 F. Supp. 3d 1135, 1145–48 (C.D. Cal. 2025). The court held that the cGMP violations alleged by Plaintiffs required precisely the kind of

product-specific scientific analysis that belongs to the FDA. *Id.* ("Plaintiffs restrict their challenge to products with more than 2 ppm of benzene, contending that they are prohibited by the FDA. . . . Plaintiffs' claims are preempted. . . . Plaintiffs . . . are unable to identify any provision of the FDCA or any FDA regulation prohibiting benzene in excess of 2 ppm in BPO-based acne medications. . . . Their citation to the broad definition of adulteration in 21 USC § 351(a), which encompasses products 'consisting in whole or in part of any filthy, putrid or decomposed substance,' is insufficient."). The *O'Dea* plaintiffs appealed to the Ninth Circuit. Nos. 25-3240 & 25-3271. The consolidated *O'Dea* appeals were voluntarily dismissed by both plaintiffs and defendants following oral argument. 25-3240 Dkt. 55.1.

In its August 2025 Order, this Court was clear that it was "inclined to grant" Defendants' motions to dismiss. MTD Order at 21–22. The Court distinguished the circumstances at bar from those in *Sprout*. There, a federal regulation flatly prohibited "nutrient content claims . . . on the front of" baby food packages. 106 F.4th at 846. The Ninth Circuit emphasized the binary nature of the alleged violation: either the defendant sold baby food pouches with nutrient content claims on the front (in violation of federal law), or it did not. *Id.* That decision was narrow and the choices unambiguous. The state law permitting private enforcement was not preempted because the state law was (1) identical to the federal law, thereby satisfying the parallelism requirement, and (2) applicable in a binary or plain fashion and thus risked no variation. *See id.* at 852. No interpretation of federal standards was required.

In contrast, this Court found that the cGMPs applicable to BPO Products were "extremely general" and "would appear to require a substantial amount of interpretation." MTD Order at 16. The Court identified three representative cGMPs that demonstrated that the cGMPs required sophisticated scientific interpretation and were not binary in nature: 21 C.F.R. §§ 211.165(a) (requiring "appropriate laboratory determination of satisfactory conformance"), 211.87 (requiring testing "as appropriate" and "as necessary" after conditions "that might adversely affect the component"), and 211.192 (requiring "thorough[] investigat[ion]" of "unexplained discrepanc[ies]"). MTD Order at 16–18. Because "the cGMP-based claims likely require statutory interpretation which may be specific to a particular drug and circumstance," the alleged

United States District Court
Northern District of California

violations of cGMPs did not appear categorical in nature and were thus likely impliedly preempted under *Sprout*. *Id.*

***Pleading deficiencies.*** The Court also found that the cGMP allegations failed to satisfy Federal Rules of Civil Procedure 8 and 9(b) because Plaintiffs did not allege how any specific cGMP was violated or how alleged deviations "deceived Plaintiffs (or the consuming public) in any consequential way." MTD Order at 21. The Court observed that Plaintiffs essentially argued Defendants "*must have* violated one of, if not all of, the twenty-one cGMP standards that they list simply because benzene-contaminated BPO Products were allowed to enter the marketplace." *Id.* (emphasis in original). By failing to assert "*how* Defendant violated or deviated from specific cGMP standards and *how* such deviations led to the adulteration of its BPO products," the complaint failed to satisfy pleading standards. *Id.* (emphases in original).

* * *

Although the Court was "inclined to grant" Defendants' motions to dismiss, to Plaintiffs' benefit, it stayed the pending motions, lifted the prior stay on discovery, and directed Plaintiffs to conduct focused written discovery and to file an amended complaint. MTD Order at 22.

C. <u>Limited Written Discovery</u>

The Court's lift of the stay on discovery was limited to "written discovery designed to determine whether the cGMPs were violated in a manner that does not require interpretation or scientific/technical judgment, *i.e.*, violations provable in a manner similar to that in *Sprout*." *Id.* The Court granted 60 days to conduct this "limited and focused written discovery" and to file an amended complaint "to allege with specificity the parallel state laws it asserts and specific facts establishing Defendants' violations of particular cGMPs and how such violations rendered BPO Products adulterated, provided that those asserted violations are limited to those which can be proven without interpretation of the cGMPs." *Id.*

Plaintiffs subsequently served written discovery requests. Defendants Padagis and Perrigo confirmed that they maintained standard operating procedures for batch testing and release. *See* Padagis Interrogatory Responses (Dkt. 88-2). With respect to cGMPs, Defendants' discovery responses indicate that they each implemented at least some procedures "compliant with" cGMPs,

United States District Court
Northern District of California

and produced documents related to these procedures.[1] *See* Dkt. 88-8 at 4; Dkt. 88-5 at 7. Defendants also confirmed that they maintain standard operating procedures "for the warehousing of finished" BPO Products, and both defendants produced documents of such procedures. *See* Dkt. 88-8 at 19; Dkt. 88-5 at 22.

Defendants' discovery responses are crucial to the analysis below. A manifest failure to engage in *any* act plainly required by the cGMPs could conceivably qualify as a violation determinable on a clear binary basis and not require statutory interpretation. But the discovery responses indicate that Defendants maintained at least *some* procedures related to cGMPs and did not absolutely fail to comply. As a result, rather than presenting a plain binary question based on a complete failure, the cGMP claims herein require a determination of whether the procedures undertaken by Defendants were so insufficient as to violate a particular cGMP. This requires interpretation and consideration of scientific evidence applied to the facts, a scenario that falls well outside of *Sprout.*

D. <u>Plaintiffs' Notice of Supplemental Authority</u>

On August 14, 2026, Plaintiffs filed a notice of supplemental authority requesting this Court consider Magistrate Judge Stanley A. Boone of the Eastern District of California's recommendation in *Navarro, et al. v. Walmart, Inc.*, Case No. 24-cv-00288, 2026 WL 2355980 (E.D. Cal. Aug. 13, 2026). Dkt. 97. Plaintiffs then filed another notice of supplemental authority on September 30, 2026 pointing this court to District Judge Jennifer L. Thurston's four-page adoption of Judge Boone's recommendation. Dkt. 101 at 1–2.

Plaintiffs ask the Court to take notice of Judge Thurston's conclusion that the *Navarro* plaintiffs' reliance on "expanded regulatory and factual allegations"—including USP Chapter <467> —were sufficient to "cure the preemption and plausibility deficiencies that afflicted the first amended consolidated class action complaint." Dkt. 101 at 1 (quoting Dkt. 101-1 (Exhibit A) at 3). Plaintiffs also ask the Court to consider Judge Thurston's acceptance of the magistrate judge's conclusion that *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) is unavailing. Dkt 101 at 2;

[1] The Court is not in receipt of Defendants' produced documents, but Plaintiffs did not object to any such productions or seek the production of additional related documents.

*see* 2026 WL 2355980 at *13 ("The Court has reviewed the case and finds that it is not apposite to the case at bar. Critically, *Durnell* did not involve the interplay between a monograph and preemption statute. Rather, in *Durnell* — a case involving pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act the issue before the Court involved only a preemption statute[.]").

The Court takes judicial notice of this authority as it would any other court decisions which might bear on the question before this Court. As noted below, however, *Navarro* does not alter this Court's conclusion.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).



United States District Court
Northern District of California

United States District Court
Northern District of California

## IV. DISCUSSION

### A. Express Preemption

The Court's August 2025 Order held that § 379r(a) of the FDCA expressly preempts Plaintiffs' state law claims insofar as they seek to require disclosure of benzene and its risks on the BPO Products' labels. MTD Order at 13. The Court's prior analysis of the express preemption issue is incorporated by reference.

Plaintiffs' amended complaint continues to plead warning-based and labeling-omission theories across all seven state law counts, contrary to the August 2025 Order's ruling; the amended complaint exceeds the permissible scope of leave to amend the express preemption issues. *See* SAC (Dkt. 85) ¶¶ 134–40 (Unfair Competition Law), 143–56 (Consumer Legal Remedies Act), 161–65 (false advertising), 168–77 (state deceptive trade statutes), 191–93 (implied warranty of merchantability), 196–208 (negligent misrepresentation), 211–15 (unjust enrichment). All such claims previously dismissed remain expressly preempted.

The Court granted limited leave to amend solely as to the cGMP violations and parallelism issues. MTD Order at 22 ("Although the Court is inclined to grant Defendants' motion to dismiss, it will permit Plaintiffs to amend their complaint to allege with specificity the parallel state laws it asserts and specific facts establishing Defendants' violations of particular cGMPs and how such violations rendered the BPO Products adulterated, provided that these asserted violations are limited to those which can be proven without interpretation of the cGMPs.").

The Orders did not invite Plaintiffs to re-allege any claims that were already found to be expressly preempted. *Id.* Plaintiffs attempt to relitigate express preemption by invoking out-of-Circuit or out-of-District decisions extends beyond the scope of the permitted amendment. *E.g.*, *In re Target Corp. BPO Sales & Mktg. Litig.*, No. 24-cv-1323 (ECT/JFD), 2026 WL 145824 (D. Minn. Jan. 20, 2026) (allowing adulteration claim to proceed because products contained benzene, and adulterated BPO products cannot be sold under federal law); *Mitchell v. Kenvue, Inc.*, No. 24-4109 (GC) (JBD), 2026 WL 509400 (D.N.J. Feb. 24, 2026) (refusing to find misbranding claims preempted); *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, No. 24-3296 (2d Cir. July 30, 2026); *see also Navarro*, 2026 WL 2355980. Plaintiffs' resurrection of these claims is not

authorized.

In any event, none of the cited decisions would alter the Court's express preemption analysis. The Supreme Court's recent *Monsanto* decision and the weight of authority applying § 379r(a) to state law warning-based claims, if anything, reinforces the Court's prior holding. *Durnell*, 609 U.S. at 387–88 ("That state labeling requirement is 'in addition to or different from' EPA's labeling determinations that do not mandate a cancer warning. Durnell's failure-to-warn claim is expressly preempted."). The Court accordingly refuses to re-visit its prior rulings in this regard.

1. <u>Parallelism of State Statutes and Express Preemption</u>

In addition to the express preemption bar identified above, a significant majority of the state statutes relied upon by Plaintiffs do not overcome the parallelism hurdle identified in the Court's August 2025 Order. This deficiency presents yet another basis on which to find Plaintiffs' claims expressly preempted.

The August 2025 Order explained that a state law claim may survive express preemption under § 379r only if the state statute "impose[s] requirements identical to federal ones." MTD Order at 19; *see also* 21 U.S.C. § 379r(a)(2) (prohibiting states from establishing "any requirement" that "is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter"). The Court's reasoning once again applies herein. A state statute that protects different interests or leaves relevant terms open to independent state interpretation does not impose an "identical" requirement even if the general subject matter overlaps. *See Sprout*, 106 F.4th at 848 ("Because the Sherman Law incorporates all the federal food labeling requirements, it is 'identical' to federal standards and not expressly preempted."); MTD Order at 11–12 (listing cases finding state laws that were not identical with the requirements of the FDCA). For the reasons stated below, the amended complaint does not cure the defect identified in the Court's prior Order.

As noted in the Court's prior order, there are state laws which satisfy parallelism. California's Sherman Law provides the clearest example, and was discussed in detail in the Court's August 2025 Order. Section 110105 of the California Health and Safety Code provides, in

relevant part:

> All good manufacturing practices regulations for any food, drug, device, or cosmetic and any amendments to the regulations adopted **pursuant to the federal act** in effect on November 23, 1970, or adopted on or after such date, are the good manufacturing practices regulations of this state.

Cal. Health & Safety Code § 110105 (emphasis added).

The California provision does precisely what the parallelism requirement demands: it adopts the federal cGMP regulations wholesale, automatically updates as the federal regulations change, and does not provide an different state law basis for liability. Thus, California's Sherman Law is not expressly preempted on its face, though applications of the Sherman Law may be impliedly preempted. *See Monsanto*, 609 U.S. at 388 n.7 (recognizing that even if plaintiff's failure-to-warn claim were not expressly preempted, they could be impliedly preempted).

A small number of other states satisfy the parallelism standard through statutes that expressly incorporate the federal cGMP definitions or the federal adulteration framework by reference. Seven of the forty-three state statutes cited in the SAC — California, Connecticut, Delaware, Illinois, Minnesota, South Carolina, and Wyoming — do so. *See* SAC ¶ 62.

The six other parallel state statutes – in addition to the California statute recited and analyzed above –specify, in relevant part:

> A drug . . . shall be deemed to be adulterated . . . (6) if it has not been manufactured in accordance with **good manufacturing practices as defined in the federal Food and Drug Act Parts 211** and 820 . . . .

Conn. Gen. Stat. § 21a-105 (emphasis added).

> A drug is deemed to be adulterated . . . (3) If it violates the definition of adulteration **as stated in the Federal Food, Drug, and Cosmetic Act**.

Del. Code Ann. tit. 16, § 3303 (emphasis added).

> A drug or device is adulterated: . . . (a)(2)(B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with **current good manufacturing practice** to assure that such drug **meets the requirements of the [federal] Act** as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess; or

410 Ill. Comp. St. § 620/14 (emphasis added).

> A drug shall be deemed to be adulterated: (1) if it consists in whole or in part of any filthy, putrid or decomposed substance; or if it has been produced, prepared, packed, or held under unsanitary conditions whereby it may have been rendered injurious to health, or whereby it may have been contaminated with filth; or if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered **in conformity with current good manufacturing practice as required under the federal act** to assure that such drug is safe and has the identity, strength, quality, and purity characteristics, which it purports or is represented to possess[.]"

Minn. St. § 151.35(1) (emphasis added).

> A drug . . . shall be deemed to be adulterated: . . . (a)(2)(B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with **current good manufacturing practice** to assure that such drug **meets the requirements of the Federal Food, Drug, and Cosmetic Act**, as amended, as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.

S.C. Code § 39-23-30(a)(2)(B) (emphasis added).

> A . . . drug is adulterated if it is adulterated **under the federal act**.

Wy. St. §§ 35-7-116 (emphasis added).

The remaining state statutes cited by Plaintiffs fail to exhibit parallelism with respect to the claims asserted herein, because they: (1) refer only to the standards of an official compendium, but are not expressly limited to requiring conformity with the federal cGMP framework; or (2) use more general phrases like "current good manufacturing practice" without expressly tethering that phrase to specific federal regulations, leaving the standard open to independent state law interpretation.

A detailed analysis of these two categories of statutory deficiencies follows.

a. <u>Category #1: Statutes Referring Only to Compendial Standards</u>

A number of the cited statutes address only adulteration for failing to meet an official compendium's purity, strength, or quality standards. These statutes say nothing about manufacturing or the cGMP framework under § 351(a)(2)(B).



United States District Court
Northern District of California

Plaintiffs cite a number of such statutes. For example:

> A drug . . . shall be deemed to be adulterated . . . (2) If it purports to be or is represented as a drug the name of **which is recognized in an official compendium and its strength differs from or its quality or purity falls below the standard set forth in such compendium**. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or, in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act.

Ga. Code § 26-3-7(2) (emphasis added).

The Georgia provision tracks 21 U.S.C. § 351(b), not § 351(a)(2)(B). It measures the finished product against USP compendium requirements, and is silent on whether the methods and facilities for drug production conform with cGMPs. While a plaintiff could possibly challenge Defendants' BPO Products for failing to meet the compendium's purity specifications under Georgia's law, Defendants' specific cGMP claims here allege that Defendants violated particular cGMP regulations governing manufacturing methods, facilities, and controls, attributing the contamination to "a critical failure in Defendant's quality control and testing protocols." SAC ¶ 73 (referring to "Defendants' failure to conform to cGMPs").

It is *that* theory for which the state law vehicle must be identical under the claims pled by Plaintiffs. Parallelism is not satisfied by reference to the language of section 351(b); That section asks whether the *finished product* meets a specification; section 351(a)(2)(B), in contrast asks whether the *process* used to make it conformed to cGMP standards. Because Georgia's statute is silent on cGMP conformity, it cannot serve as the identical state law analog for a claim upon which it is premised.

The cited Missouri statute presents the same problem:

> A drug . . . shall be deemed to be adulterated: . . . (5) If it purports to be or is represented as a drug the name of which is **recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium**. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act.

Mo. Rev. Stat. § 196.095(5) (emphasis added).



United States District Court
Northern District of California

Again, Missouri's adulteration provision measures the end product against the USP compendium, but it does not incorporate or otherwise reference the FDA's cGMP regulations.

The cited statutes from Alaska, Idaho, Kentucky, Louisiana, Maryland, Massachusetts, Nebraska, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Vermont, Washington, and West Virginia present the same problem. The statutes fail to impose a cGMP-compliance requirement identical to that in § 351(a)(2)(B). The claims brought under these state statutes, which measure drug purity against the standards of an official compendium rather than against federal cGMPs, do not run sufficiently parallel to the cGMP framework under 21 U.S.C. § 351(a)(2)(B).

To be sure, Plaintiffs' second amended complaint refers to adulteration under 21 U.S.C. § 351(b), predicated on the assertion that United States Pharmacopeia ("USP") General Chapter <467> ("Residual Solvents") establishes a binding 2 ppm benzene limit enforceable against BPO Products. *See* SAC ¶¶ 56–60. Plaintiffs allege that § 351(a) and (b) "often work hand in hand." SAC ¶ 56. When drugs are manufactured and stored in violation of GMPs, they can decompose and lose purity under § 351(a). *Id.* The same loss of purity "may also cause the drug to fail to meet the binding quality and purity standards established by the USP Chapter <467>, rendering the product *independently* adulterated under § 351(b)." *Id.* (emphasis added).

The second amended complaint's cGMP claims, however, remain premised on 21 U.S.C. § 351(a)(2)(B). That provision deems a drug "adulterated" if "the methods used in, or the facilities or controls used for, *its manufacture, processing, packing, or holding* do not conform to or are not operated or administered *in conformity with current good manufacturing practice*." 21 U.S.C. § 351(a)(2)(B) (emphasis added). While there may be a relationship to inadequate manufacturing processes and adulteration of the final product, the two sections focus on two different things.

Under section 351(b), a drug is "adulterated" if "it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium." *Id.* The "official compendium" referenced in § 351(b) is one compiled by United States Pharmacopeia ("USP"), a private, non-governmental body that publishes quality standards for pharmaceutical products. *See*

21 U.S.C. § 321(j) (defining "official compendium" as "the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, official National Formulary, or any supplement to any of them").

Only § 351(a)(2)(B) refers to federal cGMP regulations. *See* 21 U.S.C. § 351; *see also* MTD Order at 16. This distinction between § 351(a)(2)(B) and § 351(b) is critical to the parallelism analysis. These two provisions impose distinctly different duties, each addressing specific conduct. Section 351(b) asks only whether a finished product's strength, quality, or purity meets a compendium specification — it says nothing about, and requires no proof of, particular methods, facilities, or controls used to manufacture the product.

Because Plaintiffs' cGMP claims allege adulteration "as a Result of cGMP Violations," parallelism is measured against § 351(a)(2)(B), not Section 351(b). *See* SAC ¶¶ 70–73 (stating that Defendants failed "to conform to cGMPs[,]" resulting "in the production, and sale" of contaminated BPO Products).[2]

V. Category #2: Statutes That Do Not Expressly Incorporate the Federal Regulations

Another broad category of state statutes employ the phrase "current good manufacturing practice" or a similar operative phrase, without expressly tethering that phrase to the FDA's cGMPs. Unlike California's Sherman Law, which expressly provides that the FDA's cGMP regulations "are the good manufacturing practice regulations of this state," many of the cited statutes use a more general phrase without adopting the content of the federal cGMPs. That omission matters because a statute's inclusion of "current good manufacturing practice" language does not, by itself, incorporate the federal standard. A state statute using that phrase without more explicitly incorporating the FDA's regulations leaves those states free to interpret and determine, through its own regulators, legislators, or courts, what the phrase requires. *See Sprout*, 106 F.4th at 848. Thus, such statutes are not "identical" for purposes of this case.

For example, Florida's statute specifies, in relevant part:

[2] To the extent Plaintiffs attempt to assert an independent claim based on section 351(b), the Court discusses that newly asserted claim below.

> A drug or device is adulterated . . . if . . . (3) It is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding **do not conform to, or are not operated or administered in conformity with, current good manufacturing practices** to assure that the drug meets the requirements **of this part** and that the drug has the identity and strength, and meets the standard of quality and purity, which it purports or is represented to possess."

Fla. St. § 499.006(3) (emphases added).

Further, the Florida statute only requires conformity with "current good manufacturing practices to assure that the drug meets the requirements *of this part*." *Id.* "Of this part" refers to Florida's code, not the requirements of the FDCA. The standard of manufacturing conformity is thus not anchored to federal law, but to Florida law.

Montana's statutory provision presents a similar problem:

> A drug or device shall be deemed to be adulterated if it: . . . (3) is a drug and the methods used in or the facilities or controls used for its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity **with current good manufacturing practice** to assure that such drug meets the requirements **of this chapter** as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess.

Mont. Code § 50-31-305(3) (emphases added).

Like Florida's statute, "this chapter" refers to Montana's drug laws, not the FDCA. Montana's rules on strength, quality, and purity can diverge from the federal requirements, vitiating parallelism.

The relevant statutes from Arizona, Colorado, Guam, Hawai'i, Indiana, Iowa, Kansas, New Hampshire, New Mexico, North Carolina, North Dakota, Texas, and Virginia suffer from the same deficiency. Each statute uses language *similar* to the federal cGMP standard, but instead of anchoring its standards to the FDCA, these statutes refer to the requirements of non-federal law. *E.g.*, Ariz. Rev. Stat. Ann. § 32-1966 (". . . in conformity with current good manufacturing practice to assure that such drug or device meets the requirements *of this chapter* as to safety . . . .") (emphasis added); Iowa Code § 126.9(1)(c) (". . . in conformity with current good manufacturing practice to assure that the drug meets the requirements *of this chapter* as to safety . . . .") (emphasis added); Tex. Health & Safety Code Ann. § 431.111(a)(2)(B) (". . . in conformity



United States District Court
Northern District of California

with current good manufacturing practice to assure that such drug meets the requirements *of this chapter* as to safety . . . .") (emphasis added); N.C. Gen. Stat. § 106-133(1)(e) (". . . in conformity with current good manufacturing practice to assure that such drug meets the requirements *of this Article* as to safety . . . .) (emphasis added). Because the cited state statutes do not expressly incorporate or refer to the FDCA, claims premised on those statutes do not satisfy the parallelism requirement and may be dismissed on this independent ground.

* * *

Only seven state statutes cited by Plaintiffs satisfy the parallelism requirement explained in the Court's August 2025 Orders: California, Connecticut, Delaware, Illinois, Minnesota, South Carolina, and Wyoming. The other state statutes are expressly preempted. Although the seven state statutes are not expressly preempted, the cGMP claims arising under these state statutes are impliedly preempted for the reasons set forth below. Parallelism is a necessary condition, but in itself not a sufficient condition to overcome preemption.

B. <u>Implied Preemption</u>

The central dispute on the implied preemption question is whether the amended cGMP claims satisfy the standard for escaping implied preemption set forth in the Court's August 2025 Orders. There, the Court permitted Plaintiffs to amend their complaint narrowly, to allege "specific facts establishing Defendants' violations of particular cGMPs . . . limited to those which can be proven without interpretation of the cGMPs." MTD Order at 22.

The Court finds that the amended pleading fails to allege binary or plain violations of law which would bring it under *Sprout* and *Bubak*. Instead, the amended complaint focuses on technically complex questions requiring specific legal or scientific interpretation. Although the amended complaint is more specific than its predecessor in that it lists the specific cGMPs at issue, the alleged violations still turn entirely on whether the cGMPs require benzene testing of BPO Products. That question cannot be answered simply by reference to the plain text of any cited regulation alone. None of the cGMPs expressly mandate benzene testing. Instead, the inquiry requires an examination of the specific cGMPs allegedly violated – precisely the kind of product-specific scientific and technical judgment that Congress has entrusted to the FDA. The cGMP

United States District Court
Northern District of California

claims in Plaintiffs' amended complaint are therefore impliedly preempted (even in the absence of express preemption of parallel state laws).

Plaintiffs' prior complaint included a "laundry list" of twenty-one cGMPs. Plaintiffs inferred that because benzene was found in Defendants' products, Defendants "*must have* violated one of, it not all of, the twenty-one cGMP standards." MTD Order at 20 (emphasis in original). There were no specific factual allegations about (1) what testing was or was not conducted, (2) what specifications existed which were not complied with, or (3) how any supposed deviation from any identified standard caused the contamination that Plaintiffs alleged. The Court found that approach insufficient under Rule 8 and 9(b), and almost certainly preempted, because it was "impossible to decipher" from such generalities "whether Plaintiffs' state-law theory on cGMP violations involve[d] only binary determinations as in *Sprout* or, more likely, require[d] statutory interpretation." MTD Order at 18–19. The Court granted Plaintiffs leave to take discovery to see if they could flesh out the cGMP claims in a manner which would bring them under *Sprout*.

Following that limited discovery, Plaintiffs amended the complaint in an attempt to assert a more targeted approach. It alleged ten cGMP violations. These include (1) the failure to test samples for purity, strength, and quality, (2) failure to reject drug products that failed to meet established standards or specifications, and (3) other quality control criteria. SAC ¶ 70 (listing alleged cGMP violations).

Although the second amended complaint improves on specificity, it does not resolve the fatal implied preemption problem because Plaintiffs still cannot point to a cGMP that plainly requires benzene testing of BPO acne products. Plaintiffs acknowledge that no cGMPs require testing specifically of benzene, because "cGMP regulations must be general enough to encompass differences among drugs."[3] Opposition to MTD (Dkt. 89) at 8. Instead, the Plaintiffs are left to

---

[3] The absence of any cGMPs specifically requiring testing for benzene is systemic, extending beyond the cGMPs. Neither the FDCA's adulteration provision, 21 U.S.C. § 351(a), nor the OTC acne monograph governing BPO products, 21 C.F.R. §§ 333.301 *et seq.*, impose a specific benzene testing requirement, a maximum benzene concentration limit, or any other bright-line standard against which compliance could be measured without product-specific scientific analysis. Section 351(a) proscribes the sale of drugs consisting "in whole or in part of any filthy, putrid, or decomposed substance" or prepared "under insanitary conditions." 21 U.S.C. § 351(a). These

allege violations of specific cGMPs and demonstrate that an analysis of those claims are as simple and plain as that in *Sprout*.

In analyzing the *Sprout* decision in the August order, this Court reasoned that the question of whether the defendant violated the regulation at issue presented a "clear and simple binary choice." MTD Order at 19. In *Sprout*, the issue was whether the baby food pouch had a nutrient content claim on the front or it did not. No scientific or technical judgment was required to answer the question. *See also Bubak*, 2025 WL 2860044 at *2.

Plaintiffs' amended complaint must be examined against this implied preemption framework. For clarity, the Court organizes the following analysis by general categories of cGMPs.

1. <u>cGMP Group #1: Failure to Establish Scientifically Sound Specifications</u>

The second amended complaint alleges that Defendants violated cGMPs by failing to establish adequate laboratory controls for product specifications. SAC ¶ 70. That failure constitutes a violation of 21 C.F.R. §§ 211.160(a) and (b), Plaintiffs claim. *Id.*

Section 211.160(a) requires the "establishment of any specifications, standards, sampling plans, test procedures, or other laboratory control mechanisms[.]" 21 C.F.R. § 211.160(a).

Section 211.160(b) provides:

> Laboratory controls shall include the establishment of **scientifically sound and appropriate specifications**, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products **conform to appropriate standards of identity, strength, quality, and purity**. . . .

21 C.F.R. § 211.160(b) (emphases added).

This provision does not expressly mention benzene testing. Instead, the provisions employ general standards: the operative phrases — (1) "scientifically sound and appropriate," and (2) "appropriate standards of identity, strength, quality, and purity" — require the reader to supply a

---

statements are themselves general and require judgment as applied to any particular product or contaminant. It does not expressly mandate benzene testing in BPO products. And the Acne monograph specifies the permissible concentration range for active ingredients and applicable labeling and warning requirements.

United States District Court
Northern District of California

product-specific scientific judgment about what testing is actually required for that product. Determining what constitutes a "scientifically sound and appropriate" specification requires more than a binary inquiry.

The discovery record confirms that Defendants did not wholly disregard these cGMPs which could have set up a simple binary question whether the Defendants engaged in any practice consistent with the cGMPs. Instead, they maintained written procedures and documented testing protocols. For example, Defendant Padagis stated that "established specifications, standards, sampling plans, test procedures, or other laboratory control mechanisms . . . were followed and . . . documented at the time of performance." Dkt. 88-4 at 16. Defendant Perrigo stated the same and maintained that it implements "cGMP-compliant [standard operating procedures] concerning testing, sampling, storing, and approval or rejection of BPO raw material and finished Perrigo BPO Wash Products." Dkt. 88-6 at 12.

While a *complete* failure to engage in any act required by cGMPs could conceivably present a binary compliance question for the Court, that scenario is not before the Court. Whether Defendants' procedures were *adequate* under applicable cGMPs, and whether those provisions impliedly required testing specifically for benzene, necessarily requires a product-specific determination and interpretation of the cGMPs. That determination is delegated to the FDA in the exercise of its enforcement power. Accordingly, challenges based on this alleged violations of these cGMPs are impliedly preempted.

2. <u>cGMP Group #2: Batch Testing, Rejection, and Investigation</u>

The SAC alleges that Defendants (1) failed to perform adequate testing pursuant to 21 C.F.R. §§ 211.165(a) and (d), and § 211.84(d), (2) failed to test in-process materials during production pursuant to § 211.110(c), and (3) failed to reject products that fail to meet criteria pursuant to § 211.165(f). SAC ¶ 70.

Section 211.165(a) provides that: "[f]or each batch of drug product, there shall be **appropriate** laboratory determination of **satisfactory conformance** to final specifications for the drug product, including the identity and strength of each active ingredient, prior to release." 21 C.F.R. § 211.165(a) (emphasis added). Under subsection (d), the batch sampling and testing by

the quality control unity "shall be **adequate** to assure that batches of drug products meet each **appropriate specification and appropriate statistical quality control criteria** as a condition for their approval and release." 21 C.F.R. § 211.165(d) (emphasis added).

Section 211.165(f) provides that: "[d]rug products failing to meet **established standards** or specifications **or any other relevant quality control criteria** shall be rejected." *Id.* § 211.165(f) (emphasis added).

Section 211.84(d) provides standards for sampling and testing. Subsection (d)(2) provides that "[e]ach component shall be tested for conformity with **all appropriate** written specifications for purity, strength, and quality." (emphasis added.)

Section 211.110(c) provides that "[i]n-process materials shall be tested for identity, strength, quality, and purity **as appropriate**, and approved or rejected by the quality control unit, during the production process, e.g., at commencement or completion of **significant phases** or after storage for long periods." 21 C.F.R. § 211.110(c) (emphases added).

Nothing in these provisions identifies benzene as a required specification or imposes a limit on benzene quantities in products. Instead, these provisions refer to "appropriate" determinations against "established" specifications. For claims to proceed, the Court would have to determine that "appropriate" pre-release testing for BPO Products impliedly and necessarily includes benzene testing, and that "established standards or specifications or any other relevant quality control criteria" for rejection of products incorporate benzene limits. *See* 21 C.F.R. § 211.165(a) (pre-release laboratory determination); 21 C.F.R. § 211.165(f). There is no objective limit and any process of implying a limit from these imprecise guidelines would require interpretation and application of scientific judgment. In this Court's prior order on the motion to dismiss, it observed: "When is a laboratory determination 'appropriate,' such that a manufacturer can be said to have complied with § 211.165(a)? What constitutes 'satisfactory conformance'?" MTD at 17.

Whether in-process materials requiring testing and approval, or rejection "as appropriate" sometime "during the production process" or during "significant phases" or "after storage for long periods" requires an interpretive inquiry that runs afoul of preemption limitations. *See* 21 § C.F.R.

United States District Court
Northern District of California

21.110(c); *Sprout*, 106 F.4th at 848. These determinations under each provision cited by Plaintiffs require interpretation of terms of the cGMP and the application of scientific judgment, matters reserved for the FDA. State law claims based on these cGMPs are impliedly preempted.

Defendants' discovery responses do not indicate that they committed a plain or binary violation of any of these cGMPs. Defendants both responded that they maintain standard operating procedures compliant with the cGMPs "which detail the laboratory determinations used to assess whether batches of finished" BPO Products "satisfactorily conform to final specifications prior to release." Dkt. 88-5 at 7; Dkt. 88-8 at 4. In the absence of a plain or binary violation, Plaintiffs' claims as to these cGMPs are impliedly preempted under *Sprout*.

Accordingly, Plaintiffs' claims as to the asserted cGMP categories are impliedly preempted.

* * *

Plaintiffs introduce three additional arguments for why their claims are not impliedly preempted. These arguments are unavailing.

***First***, Plaintiffs argue that their claims present a binary choice permissible under *Sprout*. Under this theory, Defendants either tested for benzene, or they did not. If testing is required, failure to test for benzene is a categorical violation of law. Opposition to MTD at 6. But this argument begs the question. As explained above, whether the applicable cGMPs *require* Defendants to test for benzene is an interpretive legal and scientific question. Plaintiffs' comparison to *Sprout* fails because the regulation in *Sprout* flatly prohibited nutrition claims on the front of baby food packaging. *Sprout*, 106 F.4th at 846–48. No interpretation was required: either there was a nutrition claim on the front or there wasn't. The issues here are far more subtle and require both scientific and legal analysis.

***Second***, Plaintiffs argue that the FDA's 2021 and 2023 benzene alerts, a 2022 warning letter to a hand sanitizer manufacturer, and related FDA guidance and FAQs show that the FDA interprets the cited cGMPs as requiring benzene testing, and that courts may rely on such materials as "persuasive authority." Opposition to MTD at 5–6. This argument fails at multiple levels. First, these materials do not have "the force of federal law." *Bowen*, 118 F.4th at1148 n.12. The

Ninth Circuit has specifically held that FDA alerts of this kind are non-binding and therefore not a source of law to which a court conducting a preemption analysis should defer. *Id.* Because informal agency guidance and alerts lack the force of law, they do not serve to establish a 2 ppm legal limit on benzene in BPO Products. They do not legally override or alter the regulations on cGMPs.

Moreover, as noted above, the FDA has not amended its Acne Monograph. Furthermore, the alerts and warning letters do not state that any cGMP requires uniform benzene testing by manufacturers of BPO acne products. Rather, they continue to recite general cGMP language requiring manufacturers to establish "scientifically sound and appropriate specifications" and to test products "prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity." The cGMPs do not specify what exact contaminants and products are covered; those are matters which are subject to interpretation and a case-by-case application.[4]

***Finally***, the SAC refers to the FDA's October 2025 warning letter to Owen Biosciences, Inc., a non-party BPO product manufacturer, as direct evidence that the cGMPs require benzene testing of BPO Products. SAC ¶ 76. But that letter was issued only after the FDA detected more than 20 ppm of benzene in one lot of Owen's BPO product. *Id.* Rather than identifying a failure to test for benzene, the warning letter emphasizes that Owen "failed to ensure that [its] drug products do not contain unacceptable benzene impurity levels." *Id.* That language does not establish a benzene testing requirement generally applicable to all BPO manufacturers. Indeed, the FDA's action against Owen illustrates precisely how the regulatory scheme is intended to operate: the agency applies general cGMP requirements to specific manufacturers, product by

---

[4] The warning letter to Salon Technologies, a hand sanitizer manufacturer, is similarly unpersuasive here. The letter was directed to a specific manufacturer and "impurities [that] are a known risk of the manufacturing process." *See* Plaintiffs' Opposition to MTD at 6; Defendants' Reply at 4 n.3; U.S. Food & Drug Admin., Warning Letter to Salon Techs. Internat'l, Inc., MARCS-CMS 630566 (Dec. 21, 2022), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/salon-technologies-international-inc-630566-12212022. The letter addressed Salon Technologies' specific facility and products, and was silent as to BPO acne products. The FDA indeed concluded that benzene contamination from a hand sanitizer manufacturing process in that instance constituted a cGMP violation, but only for that manufacturer and product — there is no indication that the finding applies to Defendants. *See id.*

product, through the enforcement process.

For the foregoing reasons, Plaintiffs' cGMP claims are impliedly preempted and **DISMISSED**.

C. Plaintiffs' New Theories Fail

1. Plaintiffs' USP Theories Fail

Plaintiffs' amended complaint advances a new theory of adulteration under 21 U.S.C. § 351(b), predicated on the claim that United States Pharmacopeia ("USP") General Chapter <467> ("Residual Solvents") establishes a binding 2 ppm benzene limit enforceable against BPO Products. *See* SAC ¶¶ 56–60. That theory fails for two independent reasons.

***First***, this Court's August 2025 Order granted Plaintiffs limited leave to amend to allege "specific facts establishing Defendants' violations of particular cGMPs and how such violations rendered the BPO Products adulterated, provided that those asserted violations are limited to those which can be proven without interpretation of the cGMPs." MTD Order at 22. The new USP adulteration theory is not a cGMP theory, and the amended complaint makes clear that Plaintiffs treat the USP theory as an independent basis for liability. *See* SAC ¶ 185 ("By labeling and selling these items as 'Benzoyl Peroxide' products, Defendant represents them as drugs recognized in the USP. Under 21 U.S.C. § 352(g), a drug is misbranded if it purports to be recognized in an official compendium but fails to conform to the standards of strength, quality, or purity described therein. Because the Products fail the benzene limits and testing protocols established in USP <467>, they are misbranded as a matter of law."). By Plaintiffs' own framing, Defendants may be liable for misbranded products regardless of whether a particular cGMP was violated. That new theory exceeds the scope of Plaintiffs' leave to amend.

***Second***, even if the Court were to consider it, the USP theory fails on the merits. Under § 351(b), a drug is adulterated if it is recognized in an "official compendium" and "its strength differs from, or its quality or purity falls below, the standard set forth in such compendium." 21 U.S.C. § 351(b); *see also* 21 U.S.C. § 321(j) (defining "official compendium" to include the United States Pharmacopeia). The USP is a private, nonprofit organization that publishes quality standards for pharmaceutical products. A product sold as a compendial drug must be the thing "it



United States District Court
Northern District of California

purports to be." *Momenta Pharmaceuticals, Inc. v. Amphastar Pharmaceuticals, Inc.*, 686 F.3d 1348, 1360 (Fed. Cir. 2012).

Defendants' request for judicial notice (Dkt. 91) appends the USP entries for Benzoyl Peroxide Lotion (Dkt. 91-3) and Benzoyl Peroxide Gel (Dkt. 91-4). Those monographs define the identity, assay, and purity criteria for each product. Benzoyl Peroxide Lotion, for example, is defined to contain "NLT 90.0% and NMT 110.0% of the labeled amount of benzoyl peroxide ($C_{14}H_{10}O_4$)." Dkt. 91-3 at 2. Each monograph specifies impurity tests and acceptance criteria for certain named organic compounds, but neither monograph mandates benzene testing or establishes a definite benzene limit.

Plaintiffs argue that USP General Chapter <467> supplies a 2 ppm limit on benzene in BPO Products like those of Defendants, and they rely on Chapter <467>'s listing of "degradation of the drug substance" as one potential source of residual solvents. *See* USP <467>. Based on the surrounding text, however, that reference to a 2 ppm "concentration limit" on benzene appears to describe degradation of inputs during the *manufacturing process* rather than the subsequent (post-manufacturing), thermally driven chemical *breakdown of a finished* commercial product. *See id.* ("[I]f [Class 1 residual solvents'] use in order to produce a medicinal product is unavoidable, their levels should be restricted as shown in Table 1[.]").

Chapter <467> governs "Residual Solvents," which the USP defines as "organic volatile chemicals that *are used or produced in* the manufacture of drug substances or excipients, or in the preparation of drug products." USP Chapter <467> (emphasis added). The chapter's operative scope is organized around the manufacturing process. It defines "likely to be present" solvents as "(1) solvents used or produced in the final manufacturing step; (2) solvents used or produced in earlier manufacturing steps that are not consistently removed by a validated process; and (3) solvents properly declared by a validated supplier of a drug substance, excipient, or dietary ingredient." *Id.*

Every category refers to the manufacturing process. Chapter <467>'s discussion of benzene as a Class 1 solvent is similarly manufacturing-centered: it identifies "potential sources of benzene" as including "its presence as an impurity in a solvent *used in the manufacturing process*;

its *use in the manufacture of starting material*; or its production as a *reaction by-product*." *Id.* (emphasis added.) Each example appears to describe benzene as a product of, an input to, or direct by-product the manufacturing process, *not* as a compound *later formed after the manufacturing process* as a result of a finished drug product's instability over time under certain post-manufacture circumstances occurring well after it has left the manufacturing facility. Plaintiffs' theory is that BPO Products can degrade into benzene "when exposed to heat over time," including "during distribution, retail storage, and consumer use." *E.g.*, SAC ¶¶ 86–90. Degradation into benzene thus appears conditionally over time after completion of the manufacturing process. Plaintiffs do not allege that Defendants use benzene as a solvent in the manufacture of their products or is a reaction by-product. *See* SAC. Thus, Plaintiffs present a post-manufacture degradation theory, not a manufacturing process within the scope of General Chapter <467>.

The limited scope of the General Chapter <467> is evident not only in its terms, but also in USP's structure. The compendium addresses two categories of impurities relevant here: residual solvents, governed by Chapter <467>, and organic impurities, governed by Chapters <476> and <1086>. Chapter <1086> states that "[r]esidual solvents originate from organic liquids used as vehicles in the *synthesis* of a drug substance, as starting material, or as the intermediates involved in the *synthesis*." USP <1086> (Dkt. 91-1) (emphases added). The focus on the "synthesis" stage of the drug further reinforces the Court's understanding that USP Chapter <467> and the standards governing "residual solvents" are limited to chemicals appearing *in the manufacture process*, rather than the post-manufacture degradation of finished products.

To be sure, "organic impurities" comprise a broader category that "can arise during the manufacturing process and/or storage of the drug substance" and includes "reaction byproducts" and "degradation products" that "increase over time." *See* USP <476> (Dkt. 91-2) & <1086> (Dkt. 91-1). Benzene formed by a longer-term degradation of a finished distributed product appears to fit more cleanly into the "organic impurities" category than the "residual solvents" category. Plaintiffs, though, do not plead violations based on failure to test for purity under USP <476>. *See* SAC ¶ 57–58. Nor do they identify USP <476> as a basis for liability. *See id.*

United States District Court
Northern District of California

Neither Chapter <476> nor Chapter <1086> establish a 2 ppm benzene limit, require benzene testing, or even mention benzene. Chapter <476>, which directly addresses thresholds for degradation products, prescribes thresholds that are expressly *dose-dependent* and *product-specific*, calibrated to the "amount of drug substance administered per day" and the manufacturer's "maximum recommended labeled dosage," with the possibility of lower thresholds for unusually toxic degradants. USP <476> (Dkt. 91-2) ("Usually, the organic impurities to be controlled in the drug product are only the degradation products resulting from the degradation of the drug substance or the interaction of the drug substance with excipients and/or the primary packaging configuration. . . . Because the toxicity is dose-related, the thresholds are based on the amount of drug substance administered per day. The amount of drug substance administered per day is based upon the manufacturer's maximum recommended labeled dosage per day. Lower thresholds can be appropriate if the degradation product is unusually toxic or produces undesirable pharmacological effects.").

These standards do not set out anything like a uniform 2 ppm cap on benzene appearing in finished products. Under an implied preemption analysis similar to that discussed above, at the very least, the standards in the USP chapters themselves require further interpretation and technical analysis. Because the record contains no indication of a 2 ppm threshold for the specific products at issue, and because the Court may not engage in an interpretive exercise to determine the various USP chapters' applicability to the drug products and degradation byproducts at issue, a matter that is within the exclusive province of the FDA. Moreover, statute statutes interpreted as imposing a strict 2 ppm cap on benzene where no such express requirement is imposed by the federal laws at issue here would be expressly preempted for the reasons discussed above. In sum, Plaintiffs' USP theory fails on the merits.

D. <u>Leave to Amend</u>

The Court finds that amendment, on the facts and law as it currently stands, would be futile. Accordingly, the Court **DISMISSES** Plaintiffs' amended complaint with prejudice.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motions to dismiss with prejudice.

**IT IS SO ORDERED**.

Dated: November 23, 2026



EDWARD M. CHEN
United States District Judge